DEXTROM v WEXFORD COUNTY

Docket No. 281020. Submitted May 14, 2009, at Petoskey. Decided March 9, 2010, at 9:00 a.m.

Ron Dextrom, Tony and Donota Cassone, and other property owners in Wexford County brought an action in the Wexford Circuit Court against Wexford County, the Wexford County Landfill, and the Wexford County Department of Public Works, seeking damages for property damage and other economic injuries resulting from groundwater contamination allegedly caused by defendants' landfill. Plaintiffs alleged, in part, claims for nuisance, nuisance per se, trespass, negligence, gross negligence, and negligence per se. Defendants moved for summary disposition on the basis of governmental immunity, citing MCR 2.116(C)(7) and (10). Ron Dextrom and certain other plaintiffs filed a brief in opposition to the motion. Tony and Donota Cassone and other plaintiffs also filed a brief in opposition to defendants' motion and they also requested that summary disposition be entered in their favor under MCR 2.116(I)(2). The trial court, DAVID A. HOGG, J., denied both motions for summary disposition, stating that genuine issues of material fact existed. Defendants appealed, and Ron Dextrom and certain other plaintiffs cross-appealed.

The Court of Appeals *held*:

1. Counties have statutory authority under MCL 123.737 to own and run waste disposal facilities. Although certain provisions of the Natural Resources and Environmental Protection Act, MCL 324.101 *et seq.*, prohibit the operation of an unlicensed landfill, as defendants did for a period, those provisions do not show a legislative intent to withdraw defendants' authority to operate a refuse system for a violation of the environmental protection law. The trial court correctly concluded that a landfill of a governmental agency that is operating in violation of state licensing and environmental protection laws does not constitute an ultra vires activity of the agency not subject to the protection of governmental immunity.

2. The operation of a landfill by a governmental agency is ordinarily a governmental function, for which the governmental agency is generally immune.

3. Two tests must be satisfied before an activity may be deemed a proprietary function for purposes of the exception to governmental immunity for propriety functions. First, the activity must be conducted primarily for the purpose of producing a pecuniary profit. Second, the activity cannot normally be supported by taxes or fees. A court, in determining whether the agency's primary purpose is to produce a pecuniary profit, must consider, first, whether a profit is actually generated and, second, where the profit generated is deposited and how it is spent. The evidence shows that in 1990 the landfill began generating substantial profits, although no monies were spent on unrelated projects until from 2000 to 2005. The evidence raises a question concerning whether defendants' motivation behind the operation of the landfill changed over time. The evidence supports the inference that since 2000, perhaps earlier, the landfill was operated for the primary purpose of making a profit. The mere fact that defendants did not spend the primary portion of the landfill's profits on unrelated expenses is not conclusive proof that defendants were not nevertheless operating the landfill primarily for the purpose of producing a pecuniary profit. The trial court, in considering the motions for summary disposition under MCR 2.116(C)(10), did not err by concluding that there was a question of material fact concerning whether the landfill was being operated for the primary purpose of making a pecuniary profit, including whether that motive changed over time.

4. The fact that fees exclusively support the landfill is not sufficient in and of itself to avoid the proprietary function exception. The trial court must also consider the scope of the landfill in relation to the size of the community, its profitability, and how other communities of similar size support their landfills. The trial court, in considering the motions for summary disposition under MCR 2.116(C)(10), did not err by finding that there was a question of fact whether defendants' operation of the landfill was subject to the proprietary function exception to governmental immunity.

5. The trial court did not err by considering the affidavit of an expert for certain plaintiffs in ruling that a genuine issue of material fact existed concerning when the contamination occurred. There is no requirement that an expert's qualifications and methods be incorporated into an affidavit submitted in support of, or opposition to, a motion for summary disposition. The content of the affidavit must be admissible in substance, not form. Plaintiffs do not attack the admissibility of the content of the

affidavit, only its foundation. The affidavit need only show that the affiant, if sworn as a witness, can testify competently to the facts stated in the affidavit.

6. It is appropriate under the circumstances of this case, where further factual development is required regarding defendants' motion for summary disposition on the ground of governmental immunity and application of the proprietary function exception to governmental immunity remains a question of law for the court, for the trial court to hold an evidentiary hearing on remand for the purpose of obtaining the factual development necessary to determine whether defendants' operation of the landfill was subject to the proprietary function exception. If the trial court then determines that defendants' operation of the landfill is subject to the proprietary function exception as a matter of law, it should then deny defendants' summary disposition motion under MCR 2.116(C)(7) and proceed to trial on the substance of plaintiffs' claims. If the trial court determines that defendants' operation of the landfill is not subject to the proprietary function exception as a matter of law, then the court should grant defendants' summary disposition motion under MCR 2.116(C)(7).

Affirmed, but remanded for further proceedings consistent with the opinion of the Court of Appeals.

1. GOVERNMENTAL IMMUNITY — WORDS AND PHRASES — GOVERNMENTAL FUNCTIONS.

A governmental agency is generally immune from tort liability if it is engaged in the exercise or discharge of a governmental function; a governmental function is an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law (MCL 691.1401[f], 691.1407[1]).

2. COUNTIES — WASTE DISPOSAL FACILITIES — LICENSES — ULTRA VIRES ACTIVITIES.

Counties are authorized by statute to own and run waste disposal facilities; although certain provisions of the Natural Resources and Environmental Protection Act prohibit the operation of an unlicensed landfill by a county, those provisions do not show a legislative intent to withdraw a county's authority to operate a waste disposal facility for a violation of the environmental protection laws; a county landfill operating in violation of state licensing and environmental protection laws does not constitute an ultra vires activity (MCL 123.737, 324.11509, 324.11512[2]).

3. GOVERNMENTAL IMMUNITY — PROPRIETARY FUNCTION EXCEPTION.

> An activity conducted by a governmental agency, before it may be deemed a proprietary function, must satisfy two tests: the activity must be conducted primarily for the purpose of producing a pecuniary profit and it cannot normally be supported by taxes or fees; whether a profit is actually generated, where a profit is deposited, and how it is spent must first be considered in determining whether the agency's primary purpose is to produce a pecuniary profit (MCL 691.1413).

4. GOVERNMENTAL IMMUNITY — PROPRIETARY FUNCTION EXCEPTION.

> The proprietary function exception to governmental immunity does not apply to an activity if the activity is normally supported by taxes or fees, even if the activity is conducted for the primary purpose of making a pecuniary profit; it is important to consider the type of activity under examination when deciding whether an activity is normally supported by taxes or fees (MCL 691.1413).

5. WITNESSES — MOTIONS AND ORDERS — EXPERT WITNESSES — AFFIDAVITS — SUMMARY DISPOSITION.

> The qualifications and methods employed by an expert need not be incorporated into an affidavit by the expert submitted in support of, or opposition to, a motion for summary disposition; the content of the affidavit must be admissible in substance, not form (MCR 2.116[G][6], 2.119[B][1]).

6. GOVERNMENTAL IMMUNITY — PROPRIETY FUNCTION EXCEPTION.

> The determination whether the proprietary function exception to governmental immunity is applicable in an action is a question of law for the court; a trial court may hold an evidentiary hearing to obtain the factual development necessary to determine whether a governmental agency's activities are subject to the proprietary function exception (MCL 691.1413).

*Olson, Bzdok & Howard, P.C.* (by *Christopher M. Bzdok* and *Jeffrey L. Jocks*), for Ron Dextrom and others.

*Law Offices of James P. O'Neill & Associates* (by *James P. O'Neill*) and *Davis Listman PLLC* (by *Robert C. Davis*) for Tony and Donota Cassone and others.

*Miller, Canfield, Paddock and Stone, P.L.C* (by *Dean M. Altobelli*), for Wexford County, Wexford County Landfill, and Wexford County Department of Public Works.

Before: WHITBECK, P.J., and DAVIS and GLEICHER, JJ.

PER CURIAM. This case arises from the operation of a landfill by defendants, Wexford County, Wexford County Landfill, and the Wexford County Department of Public Works. Plaintiffs are property owners who allege that contaminants from the landfill entered their groundwater, causing property damage and other economic injuries. Defendants asserted a defense of governmental immunity. The trial court found that, although defendants' unlicensed operation of the landfill was not ultra vires, there were questions of material fact concerning whether the operation fell within the proprietary function exception to governmental immunity.[1] Defendants now appeal as of right the trial court's order denying their motion for summary disposition. And certain plaintiffs[2] cross-appeal, challenging the trial court's denial of their cross-motion for summary disposition. We affirm, but remand for further proceedings.

I. BASIC FACTS AND PROCEDURAL HISTORY

In late 1973, Wexford County and its Department of Public Works commenced operation of the Wexford County Landfill. A special use permit that the state of Michigan issued allowed Wexford County and the Department of Public Works to establish the landfill on an 80-acre site of state-owned land in Cedar Creek Township. Throughout the 1970s and 1980s, the landfill

---

[1] MCL 691.1413.

[2] Plaintiffs have divided themselves into two groups represented by different counsel. We refer to the group that filed a summary disposition motion in the trial court, and now cross-appeal, as "certain plaintiffs."

accepted waste only from Wexford County residents. In 1990, the landfill began accepting waste from Missaukee County, which borders Wexford County. The Missaukee County waste that the landfill accepted has never accounted for more than 13.2 percent of the landfill's total refuse intake.

During the 1980s, concerns emerged regarding possible contamination of the groundwater flowing beneath the landfill. In 1984, analysis of water collected from monitoring wells revealed the presence of chemical contaminants attributable to the landfill, and in 1986, the Michigan Department of Natural Resources recommended capping portions of the landfill to prevent further contamination. Defendants and the Department of Natural Resources engaged in a lengthy and contentious dispute over the measures necessary to prevent further groundwater contamination. In 1989, the Department of Public Works and the Department of Natural Resources entered into a consent order, which observed, in relevant part, "The Department alleges, but the County DPW does not admit, that past landfill operations and other disposal activities at the disposal site has [sic] resulted in, and continues to cause, unpermitted discharges to, and resultant contamination of, the groundwaters of the State . . . ." Pursuant to the consent order, the Department of Public Works agreed to implement a remedial action plan calling for the complete closure of unlined landfill areas, additional investigation of the extent of landfill-connected groundwater contamination, and maintenance of monitoring wells. Later, Wexford County also agreed to install a "groundwater pump and treat[ment] system, consisting of five . . . extraction wells and an aeration pond."

Defendants did not promptly close all unlined landfill locations, and for several years after the consent agreement's execution, the Department of Natural Resources refused to license the facility. Defendants eventually implemented remediation efforts satisfactory to the Department of Natural Resources, and the landfill regained its license. Cleanup and monitoring activities continued through the 1990s, and in 2002, defendants entered into a second consent order with the Department of Natural Resources and Environment.[3] Subsequent detection of more contamination obligated Wexford County to expend substantial sums for wells, pumps, and other equipment. In 2004, Wexford County agreed to provide an alternate water system for residents with contaminated wells.

Notwithstanding significant Wexford County expenditures related to environmental remediation, the landfill generated a profit from 1984 through 2002. Historical audit information that Wexford County submitted revealed that the landfill achieved its greatest profit in 2000, when its assets minus liabilities totaled slightly more than $12 million. Between 2000 and 2006, Wexford County spent approximately $27.6 million of landfill revenues on activities directly related to the landfill, including contamination investigation, contamination cleanup, and preventative measures mandated by the consent orders. Within the same period, Wexford County spent 10 percent of landfill profits, about $2.7 million, on activities unrelated to the landfill, including insurance expenses, courthouse bond payments, contributions to the general fund, and a 911 radio project.

---

[3] The Department of Natural Resources is now known as the Department of Natural Resources and Environment.

Plaintiffs commenced this action in September 2006, asserting claims for nuisance, nuisance per se, trespass, negligence, gross negligence, and negligence per se.[4] In May 2007, defendants moved for summary disposition of plaintiffs' tort claims on the basis of governmental immunity, citing MCR 2.116(C)(7) and (10). Defendants argued that (1) the landfill operation qualified as a governmental function, (2) defendants had not operated the landfill for the primary purpose of making a profit, and (3) user fees had always "almost exclusively" supported the landfill. Defendants further argued that the contamination had taken place in the 1970s and 1980s, when the landfill was still using unlined cells, well before there were any transfers out of the landfill's fund to pay for unrelated projects.

Certain plaintiffs filed a brief in opposition to defendants' motion, arguing that defendants were not entitled to immunity because their operation of the landfill was in violation of the law and, therefore, ultra vires. Further, certain plaintiffs argued that defendants were not entitled to immunity because the landfill operation was proprietary, conducted for the purpose of making a profit, and not of the size or scope normally supported by fees or taxes in a community the size of Wexford County. Certain plaintiffs added that even if the landfill was covered by governmental immunity in the 1970s and 1980s, defendants could not show that the contamination originated at that time. Certain plaintiffs submitted the affidavit of Christopher Grobbel, who opined that contamination was still flowing from the landfill at the present time. Certain plaintiffs asked that summary disposition be entered in their favor.

---

[4] The complaint also contains an inverse condemnation count, which is not involved in this appeal. In January 2007, an amended complaint was filed that added more plaintiffs, but reiterated the same counts in the original complaint.

The remaining plaintiffs filed a brief in opposition to defendants' motion, also requesting that summary disposition be entered in their favor under MCR 2.116(I)(2). Like certain plaintiffs, these plaintiffs argued that defendants were not entitled to immunity because the landfill operation was proprietary, and was not of the size or scope normally supported by fees or taxes in a community the size of Wexford County.

At a hearing on the cross-motions for summary disposition, defendants briefly argued, for the first time, that Grobbel's affidavit was inadmissible because it did not list his expert qualifications or explain his methods, and, therefore, should not be considered by the trial court. The trial court took the parties' cross-motions under advisement.

The trial court later issued a written opinion and order denying both motions for summary disposition. After reciting some of the landfill revenue and expenditure evidence, the trial court deemed summary disposition inappropriate on the first prong of the proprietary function test, because "[t]he County's purpose in operating the landfill for pecuniary profit has not been conclusively proved or refuted by the numerous exhibits filed by the parties. Trial testimony of the people who made these decisions is necessary to accurately adjudicate this issue." The trial court opined that questions of fact also existed regarding whether "units of government like Wexford County" commonly "engage in business activities of this magnitude primarily to meet the garbage disposal needs of their residents, or are landfills of this size and type usually maintained for profit by public or private entities[.]" Accordingly, the trial court stated that "[t]his question is unanswered by the documentary evidence and presents a genuine issue

of material fact that must be addressed at trial." The trial court also noted the possibility that the landfill's primary purpose might have changed over time, and that "[i]f facts at trial show this to be true, the time when the contamination occurred becomes material to the issue of governmental immunity."

Therefore, the trial court found that the parties' competing expert testimony "discloses the time of contamination to be a disputed issue of fact." The trial court also rejected plaintiffs' suggestion that defendants had engaged in ultra vires conduct, finding that "[a] landfill operating in violation of state licensing requirements is not a [sic] *ultra vires* activity and must be afforded governmental immunity, unless another specific exception applies."

## II. MOTIONS FOR SUMMARY DISPOSITION UNDER MCR 2.116(C)(10)

### A. STANDARD OF REVIEW

We first consider the motions for summary disposition under MCR 2.116(C)(10). Under that court rule, a party may move for dismissal of a claim on the ground that there is no genuine issue with respect to any material fact and the moving party is entitled to judgment as a matter of law. The moving party must specifically identify the undisputed factual issues and support its position with documentary evidence.[5] When reviewing a motion for summary disposition brought under MCR 2.116(C)(10), a court must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact

---

[5] MCR 2.116(G)(3)(b) and (4); *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).

exists.[6] A question of fact exists when reasonable minds could differ as to the conclusions to be drawn from the evidence.[7]

This Court reviews de novo a trial court's decision on a motion for summary disposition,[8] as well as questions of statutory interpretation[9] and the construction and application of court rules.[10]

### B. ULTRA VIRES ACTIVITY

A governmental agency is generally immune from tort liability "if the governmental agency is engaged in the exercise or discharge of a governmental function."[11] And a governmental function is "an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law."[12]

Here, there can be no dispute that operation of a landfill is ordinarily a governmental function. In *Coleman v Kootsillas*,[13] the Michigan Supreme Court noted

---

[6] MCR 2.116(G)(5); *Maiden*, 461 Mich at 120; *Quinto v Cross & Peters Co*, 451 Mich 358, 361-362; 547 NW2d 314 (1996); see also *Smith v Globe Life Ins Co*, 460 Mich 446, 454-455 & n 2; 597 NW2d 28 (1999).

[7] *Glittenberg v Doughboy Recreational Indus (On Rehearing)*, 441 Mich 379, 398-399; 491 NW2d 208 (1992), reh den sub nom *Spaulding v Lesco Int'l Corp*, 441 Mich 1202 (1992).

[8] *Maiden*, 461 Mich at 118; *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998); *Tillman v Great Lakes Truck Ctr, Inc*, 277 Mich App 47, 48; 742 NW2d 622 (2007); *Guerra v Garratt*, 222 Mich App 285, 288; 564 NW2d 121 (1997).

[9] *Heinz v Chicago Rd Investment Co*, 216 Mich App 289, 295; 549 NW2d 47 (1996).

[10] *Wickings v Arctic Enterprises, Inc*, 244 Mich App 125, 133; 624 NW2d 197 (2000).

[11] MCL 691.1407(1).

[12] MCL 691.1401(f).

[13] *Coleman v Kootsillas*, 456 Mich 615, 619; 575 NW2d 527 (1998).

that, "with respect to a municipality's collection and disposal of its own garbage, its activities involve a governmental function." "Cities have a statutory right to own and run facilities to dispose of their own waste and garbage."[14] "Moreover, they may form agreements jointly to run the facilities."[15] Garbage collection and disposal is "a matter of public health and a governmental function," even if the garbage comes from other jurisdictions.[16]

However, certain plaintiffs' contend that defendants' operation of the landfill without a license and in disregard of applicable environmental regulations constituted an ultra vires activity not subject to the protection of governmental immunity.

In *Richardson v Jackson Co*,[17] the Michigan Supreme Court contrasted governmental functions with ultra vires activities, explaining that "governmental agencies are not entitled to immunity under the act for injuries arising out of ultra vires activity, defined as activity *not* expressly or impliedly mandated or authorized by law." In *Richardson,* a person drowned at a public beach located in a county park and the plaintiff alleged that governmental immunity did not apply because the county's operation of a swimming beach was in violation of various sections of the Marine Safety Act.[18, 19] However, the county was statutorily authorized "to operate, equip, and maintain this beach as a recre-

---

[14] *Id.* at 619-620, citing MCL 123.261 and MCL 324.4301.

[15] *Id.* at 620.

[16] *Id.*

[17] *Richardson v Jackson Co*, 432 Mich 377, 381; 443 NW2d 105 (1989) (emphasis in original).

[18] Then codified as MCL 281.1001 *et seq.*

[19] *Richardson,* 432 Mich at 380.

ational facility."[20] Accordingly, the Supreme Court framed the issue presented in *Richardson* as "how the . . . governmental function test applies to an activity authorized generally by one statute, yet regulated by another."[21]

In resolving the issue, the Supreme Court explained that activities authorized by one statute, yet regulated by another, generally remain subject to and protected by governmental immunity:

> Enabling acts, which grant authority in broad terms, must be distinguished from regulatory statutes. Improper performance of an activity authorized by law is, despite its impropriety, still "authorized" within the meaning of the . . . governmental function test. An agency's violation of a regulatory statute that requires the agency to perform an activity in a certain way cannot render the activity ultra vires, as such a conclusion would swallow the [governmental immunity] rule by merging the concepts of negligence and ultra vires.
>
> In applying the "governmental function" test of the immunity statute, this Court must consider that statute's breadth. The statute extends immunity "to *all* governmental agencies for *all* tort liability *whenever* they are engaged in the exercise or discharge of a governmental function."[22] Nothing in the governmental immunity act suggests [that] the Legislature intended to treat the failure to meet a "condition precedent," *such as obtaining a license or permit*, any differently for immunity purposes than the failure to meet other sorts of regulatory duties. None of the act's four narrowly drawn exceptions single out activity conditioned on permits or licenses for special treatment. . . . [A]ctivities conducted in violation of regulations other than approval requirements are as "unauthorized" as activities

---

[20] *Id.* at 385; see MCL 123.51.

[21] *Richardson*, 432 Mich at 381.

[22] Emphasis in original.

conducted without proper approval. *Licensing is nothing more than an intense form of regulation.*

The Legislature did not intend that the term "governmental function" be interpreted so that immunity for activity authorized generally by statute should evaporate upon the failure to perform a regulatory condition contained in another statute. *In sum, ultra vires activity is not activity that a governmental agency performs in an unauthorized manner. Instead, it is activity that the governmental agency lacks legal authority to perform in any manner.*[23]

The Supreme Court held that the Legislature's imposition of a "regulatory duty" on operators of public beaches did not signal its intent "to condition all authority to engage in that activity upon compliance with that duty."[24]

Here, the statute authorizing defendants' landfill operation reads:

A county establishing a department of public works shall have the following powers to be administered by the board of public works subject to any limitations thereon:

\*   \*   \*

(c) To acquire a refuse system[25] within 1 or more areas in the county and to improve, enlarge, extend, operate, and maintain the system.[26]

---

[23] *Richardson*, 432 Mich at 385-387 (emphasis added; citations omitted).

[24] *Id.* at 383.

[25] The term "refuse system" means "disposal, including all equipment and facilities for storing, handling, processing, and disposing of refuse, including plants, works, instrumentalities, and properties, used or useful in connection with the salvage or disposal of refuse and used or useful in the creation, sale, or disposal of by-products, including rock, sand, clay, gravel, or timber, or any portion or any combination thereof." MCL 123.731(e).

[26] MCL 123.737.

Counties thus have statutory authority to own and run waste disposal facilities.

Certain plaintiffs nevertheless contend that defendants' violations of MCL 324.11509 and MCL 324.11512(2), which are parts of the Natural Resources and Environmental Protection Act (NREPA),[27] divested defendants of their authority to operate the landfill. Both of these NREPA sections prohibit the operation of an unlicensed landfill, as defendants did in this case. However, neither of these NREPA provisions evinces a legislative intent to withdraw defendants' authority to operate a "refuse system" for a violation of the environmental protection laws. Therefore, the trial court correctly concluded that a landfill operating in violation of state licensing and environmental protection laws does not constitute an ultra vires activity.

### C. THE PROPRIETARY FUNCTION EXCEPTION TO GOVERNMENTAL IMMUNITY

As explained above, defendants' operation of a landfill constitutes a governmental function, for which a governmental agency is generally immune.[28] However, there are exceptions to the rule of governmental immunity, including the proprietary function exception, which provides, in pertinent part:

> The immunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. *Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit* for the governmental agency, *excluding, however, any activity normally supported by taxes or fees.*[29]

---

[27] MCL 324.101 *et seq.*

[28] MCL 691.1407(1); *Coleman*, 456 Mich at 619.

[29] MCL 691.1413 (emphasis added).

In *Hyde v Univ of Mich Bd of Regents*,[30] the Supreme Court found that this definition is "quite specific and needs no interpretation." The Court explained that before an activity is deemed a proprietary function, it must satisfy two tests: "1) [t]he activity must be conducted primarily for the purpose of producing a pecuniary profit, *and* 2) [t]he activity cannot normally be supported by taxes or fees."[31]

### 1. PECUNIARY PROFIT PURPOSE

Defendants argue that the landfill was operated primarily to meet its citizens' waste disposal needs, not primarily to make a profit.

In determining whether the agency's primary purpose is to produce a pecuniary profit, a court must first consider "whether a profit is actually generated," and second must consider " 'where the profit generated by the activity is deposited and how it is spent.' "[32]

In *Hyde*, the Supreme Court noted that the proprietary function exception turns on the agency's motive; it does not *require* that the activity "actually generate a profit . . . ."[33] The Court explained that "[i]f the availability of immunity turned solely upon an examination of the ledgers and budgets of a particular activity, a fiscally responsible governmental agency would be 'rewarded' with tort liability for its sound management decisions."[34] "Such a rule could discourage implementation of cost-efficient measures and encourage deficit

---

[30] *Hyde v Univ of Mich Bd of Regents*, 426 Mich 223, 257; 393 NW2d 847 (1986).

[31] *Id.* at 258 (emphasis in original).

[32] *Coleman*, 456 Mich at 621.

[33] *Hyde*, 426 Mich at 258.

[34] *Id.*

spending."[35] It would also be difficult to implement, in that a particular activity could generate a profit one year and operate at a loss the next.[36] Conversely, "[t]he existence of a profit is not an irrelevant consideration . . . ."[37] Consistently operating at a loss may be evidence that the primary purpose of the activity is something other than to make a profit, while consistently making a profit may be evidence of intent to make a profit.[38] "However, § 13 permits imposition of tort liability only where the *primary* purpose is to produce a pecuniary profit."[39] "It does not penalize a governmental agency's legitimate desire to conduct an activity on a self-sustaining basis."[40]

"Another relevant consideration is where the profit generated by the activity is deposited and how it is spent."[41] If the profit is deposited in a general fund and used to finance unrelated activities, this could indicate that the activity was intended as "a general revenue-raising device."[42] Conversely, "[i]f the revenue is used only to pay current and long-range expenses involved in operating the activity, this could indicate that the primary purpose of the activity was not to produce a pecuniary profit."[43]

The evidence in this case showed that until 1989, all garbage that the landfill processed came from Wexford County. Since 1990, approximately six percent of the

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* at 258-259 (emphasis in original).

[40] *Id.* at 259.

[41] *Id.*

[42] *Id.*

[43] *Id.*

garbage that the landfill receives comes from neighboring Missaukee County. The percentage of the landfill's yearly operating revenue attributable to Missaukee County waste has fluctuated from 0.6 percent the first year (1990) to a high of 13.2 percent in 2005, during a special project.

The landfill has been making a profit since 1984. The landfill's profits and interest on those profits were deposited into a landfill fund. Between 1989 and 2000, the fund's unrestricted assets increased from $948,894 to $13,710,372. Through 1999, these funds were not used for any purpose unrelated to the landfill. *But* between 2000 and 2005, the landfill transferred approximately $2.7 million out of the landfill fund for uses unrelated to the landfill. As the following chart shows, for the first three years, the amounts of these unrelated transfers were approximately half of the landfill's annual net earnings plus interest, until the landfill started losing money. The unrelated transfers continued for three years after the landfill began losing money, but stopped in 2006.

| Year | Net Earnings (operating earnings) | Interest (non-operating earnings) | Net Earnings plus Interest | Unrelated Transfers | Percentage (of net Earnings plus Interest) |
|------|------|------|------|------|------|
| 2000 | 379,440 | 725,157 | 1,155,869 | 752,175 | 65.0% |
| 2001 | 428,376 | 368,329 | 1,153,533 | 566,559 | 49.1% |
| 2002 | 262,554 | 256,077 | 630,883 | 395,091 | 62.6% |
| 2003 | (630,521) | 264,692 | (374,444) | 339,713 | N/A |
| 2004 | (1,777,797) | 288,982 | (1,513,105) | 334,015 | N/A |
| 2005 | (3,193,570) | 205,130 | (2,904,588) | 330,000 | N/A |

The evidence shows that in approximately 1990, the landfill began generating and accumulating substantial profits, although no monies were spent on unrelated projects. However, from 2000 until 2005, substantial sums were transferred out of the landfill fund to finance unrelated projects. Additionally, statements from various county officials raise questions about the motivation behind operation of the landfill. Plaintiffs cite numerous instances of county officials making statements that indicate a profit-making motive. The evidence raises a question concerning whether defendants' motivation changed over time and supports an inference that since 2000, perhaps earlier, the landfill was operated for the primary purpose of making a profit. Further, contrary to defendants' contentions, the mere fact that defendants did not spend the primary portion of the landfill's profits on unrelated expenses is not conclusive proof that defendants were not nevertheless operating the landfill primarily for the purpose of producing a pecuniary profit.

Thus, in considering the motions for summary disposition under MCR 2.116(C)(10), we conclude that the trial court did not err by concluding that there was a question of material fact concerning whether the landfill was being operated for the primary purpose of making a pecuniary profit, including whether that motive changed over time.

### 2. ACTIVITY NORMALLY SUPPORTED BY TAXES OR FEES

The Supreme Court has stated that even if an activity is conducted for the primary purpose of making a profit, the proprietary function exception does not apply if the activity is normally supported by taxes or fees.[44] "When deciding whether an activity satisfies the

---

[44] *Coleman*, 456 Mich at 622 n 8; *Hyde*, 426 Mich at 259-260.

second part of the proprietary function test, it is important to consider the type of activity under examination."[45]

In *Coleman*, the city of Riverview accepted garbage, not just from its residents, but from numerous other sources, including Wayne County and the province of Ontario, Canada.[46] The *Coleman* Court found that "[a]n enterprise of such vast and lucrative scope is simply not normally supported by a community the size of the city of Riverview [with 14,000 residents] either through taxes or fees."[47] The Court added:

> The fact that the city charges fees to garbage haulers unloading refuse into its landfill does not alter this conclusion. *Any governmental activity must exact a fee if it is to produce a pecuniary profit.* If imposition of a use fee like Riverview's would suffice to defeat the proprietary function exception to governmental immunity, almost no city activity would subject a city to liability. That could not have been the intention of the Legislature.[48]

The Court concluded that the proprietary function test had been met and that the city of Riverview was not immune from tort liability.[49]

Here, it is undisputed that fees exclusively support the landfill. However, as *Coleman* states, that fact alone is not sufficient to avoid the proprietary function exception. Defendants argue that the trial court erred when, in examining the issue whether an activity is "normally supported by taxes or fees," it sought evidence of how other communities support their landfills. In applying this part of the proprietary function test, however, the

---

[45] *Coleman*, 456 Mich at 622.

[46] *Id.* at 616-617, 622-623.

[47] *Id.* at 623.

[48] *Id.* (emphasis added).

[49] *Id.* at 623-624.

*Coleman* Court compared the scope and profitability of the landfill in relation to the size of the community.[50] Thus, the Court looked at how other communities supported their landfills, rather than merely the funding history of the activity in question. Therefore, under *Coleman*, the trial court must consider the scope of defendants' landfill in relation to the size of the community, its profitability, and how other communities of similar size support their landfills.

Thus, in considering the motions for summary disposition under MCR 2.116(C)(10), we conclude that the trial court did not err by finding that there was a question of fact whether defendants' operation of the landfill was subject to the proprietary function exception to governmental immunity.

### D. CONTAMINATION

Defendants argue that the trial court erred by considering the affidavit of certain plaintiffs' expert Christopher Grobbel in finding that a question of material fact existed with regard to when the alleged contamination occurred. Defendants contend that Grobbel's affidavit should not have been considered because the reliability standards required by MRE 702 were not satisfied.

The evidentiary rule that governs expert testimony, MRE 702, provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on

---

[50] *Id.* at 623.

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[51]

Further, MCR 2.116(G)(6) provides that "[a]ffidavits . . . offered in support of or in opposition to a motion based on subrule (C)(1)–(7) or (10) shall only be considered to the extent that the content or substance would be admissible as evidence to establish or deny the grounds stated in the motion." However, in addressing this requirement, the Michigan Supreme Court in *Maiden v Rozwood*,[52] approvingly quoted *Winskunas v Birnbaum*,[53] which explained:

> "The evidence need not be in admissible form; affidavits are ordinarily not admissible evidence at a trial. But it must be admissible in content . . . . Occasional statements in cases that the party opposing summary judgment must present admissible evidence . . . should be understood in this light, as referring to the content or substance, rather than the form, of the submission."

Moreover, MCR 2.119(B)(1) provides:

> If an affidavit is filed in support of or in opposition to a motion, it must:
>
> (a) be made on personal knowledge;
>
> (b) state with particularity facts admissible as evidence establishing or denying the grounds stated in the motion; and
>
> (c) show affirmatively that the affiant, if sworn as a witness, can testify competently to the facts stated in the affidavit.

---

[51] See also *Craig v Oakwood Hosp*, 471 Mich 67; 684 NW2d 296 (2004); *Gilbert v DaimlerChrysler Corp*, 470 Mich 749; 685 NW2d 391 (2004).

[52] *Maiden*, 461 Mich at 124 n 6.

[53] *Winskunas v Birnbaum*, 23 F3d 1264, 1267-1268 (CA 7, 1994) (citations omitted; original emphasis in *Winskunas* omitted).

Thus, there is no requirement that an expert's qualifications and methods be incorporated into an affidavit submitted in support of, or opposition to, a motion for summary disposition. Rather, the *content* of the affidavits must be admissible in *substance*, not form.[54] And the requirements of MRE 702 are foundational to the admission of the expert's testimony at trial. Thus, it is significant that defendants here do not attack the admissibility of the content of Grobbel's affidavit, only its foundation. As MCR 2.119(B)(1)(c) provides, the affidavit need only show that the affiant, *if sworn as a witness*, can testify competently to the facts stated in the affidavit. Whether Grobbel will ultimately meet the MRE 702 requirements to be sworn as a witness is a matter reserved for trial. Thus, in considering the motions for summary disposition under MCR 2.116(C)(10), we conclude that the trial court did not err by considering Grobbel's affidavit in ruling that a genuine issue of material fact existed concerning when the contamination occurred.

### III. MOTION FOR SUMMARY DISPOSITION UNDER MCR 2.116(C)(7)

#### A. STANDARD OF REVIEW

Of crucial importance here is that defendants also brought their motion for summary disposition under MCR 2.116(C)(7). MCR 2.116(C)(7) provides that a motion for summary disposition may be raised on the ground that a claim is barred because of immunity granted by law. When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them.[55]

[54] MCR 2.116(G)(6); *Maiden*, 461 Mich at 124 n 6.

[55] *Maiden*, 461 Mich at 119; *Guerra*, 222 Mich App at 289.

If any affidavits, depositions, admissions, or other documentary evidence are submitted, the court must consider them to determine whether there is a genuine issue of material fact.[56] If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court.[57] However, if a question of fact exists to the extent that factual development could provide a basis for recovery, dismissal is inappropriate.[58]

### B. THE TRIAL COURT'S OPINION

In resolving the motions for summary disposition, the trial court found that summary disposition must be denied because there existed questions of fact that would best be resolved at a trial. Specifically, with respect to the pecuniary-profit-purpose test of the proprietary function exception, the trial court concluded that *"[t]rial* testimony of the people who made these decisions [regarding the landfill's purpose] is necessary to accurately adjudicate this issue."[59] Further, with respect to the question whether the landfill is the type of activity normally supported by taxes or fees, the trial court concluded that "[t]his question is unanswered by the documentary record and presents a genuine issue of material fact that must be addressed *at trial*."[60] The trial court made no particular distinction between MCR 2.116(C)(7) and MCR 2.116(C)(10), and did not state or imply that it recognized that a motion under MCR

---

[56] MCR 2.116(G)(5); *Maiden*, 461 Mich at 119; *Guerra*, 222 Mich App at 289.

[57] *Guerra*, 222 Mich App at 289.

[58] *Id.*

[59] Emphasis added.

[60] Emphasis added.

2.116(C)(7) ultimately presents a question of law for the court to decide rather than a question of fact within the jury's province.

### C. GOVERNMENTAL IMMUNITY AS A QUESTION OF LAW

As we have stated above, when reviewing a motion for summary disposition brought under MCR 2.116(C)(10), the court must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists.[61] If the court does determine that a genuine issue of material fact exists, then the motion must be denied and the issues are left to a fact-finder to resolve at a trial. Thus, we have stated, the trial court did not err by finding that there were unresolved questions of fact as to whether defendants' operation of the landfill was subject to the proprietary function exception to governmental immunity. And we agree with the trial court that the inconclusive nature of the evidence requires further inquiry and clarification.

However, to the extent that the trial court envisioned that such further inquiry and clarification would be arrived at during a *trial*, with either the court sitting as a finder of fact or a jury serving the same function, we disagree. A *trial* is not the proper remedial avenue to take in resolving the factual questions under MCR 2.116(C)(7) dealing with governmental immunity. Indeed, the crux of the case is the determination of the threshold issue whether governmental immunity protects defendants' conduct or whether that conduct fell outside the immunity protection through application of the proprietary function exception.

---

[61] MCR 2.116(G)(5); *Maiden*, 461 Mich at 120; *Quinto*, 451 Mich at 361-362; see also *Smith*, 460 Mich at 454-455 & n 2.

Although courts should start with the pleadings when reviewing a motion brought under MCR 2.116(C)(7), courts must also consider any affidavits, depositions, admissions, or other documentary evidence that the parties submit to determine whether there is a genuine issue of material fact.[62] "[T]he trial court [is] obligated to evaluate the specific conduct alleged to determine whether a valid exception exists."[63] If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of the facts, the question whether the claim is barred is an issue of law for the court.[64] *But* if a question of fact exists so that factual development could provide a basis for recovery, caselaw states that dismissal without further factual development is inappropriate.[65] And it is under this latter circumstance—where there are questions of fact necessary to resolve the ultimate issue whether governmental immunity applies—that we believe the (C)(7) procedure diverges from the (C)(10) procedure.

As we stated above, under MCR 2.116(C)(10), if the court does determine that a genuine issue of material fact exists, then it must deny the motion and leave the issues of *fact* to a fact-finder to resolve *at a trial*. But we must reconcile this procedure with the fact that application of the proprietary function exception to governmental immunity remains a question of *law* for the court.[66]

---

[62] MCR 2.116(G)(5); *Maiden*, 461 Mich at 119; *Coleman*, 456 Mich at 618; *Herman v Detroit*, 261 Mich App 141, 143-144; 680 NW2d 71 (2004); *Guerra*, 222 Mich App at 289.

[63] *Walsh v Taylor*, 263 Mich App 618, 624; 689 NW2d 506 (2004).

[64] *Guerra*, 222 Mich App at 289.

[65] *Id.*

[66] *Briggs v Oakland Co*, 276 Mich App 369, 371; 742 NW2d 136 (2007); *Laurence G Wolf Capital Mgt Trust v City of Ferndale*, 269 Mich App 265, 270; 713 NW2d 274 (2005).

Our review of relevant caselaw fails to definitively resolve this dilemma.[67] However, we conclude that caselaw supports a remand for an evidentiary hearing as an acceptable remedy under the circumstance. In *Laurence G Wolf Capital Mgt Trust v City of Ferndale*,[68] the trial court held that "further factual development was required" with regard to the defendants' motion for summary disposition on the ground of governmental immunity. And in *Hyde*, a trial court conducted a "full evidentiary hearing" and made "findings of fact and law" to determine whether the defendant's conduct constituted a proprietary function.[69]

Accordingly, we instruct the trial court to hold an evidentiary hearing for the purpose of obtaining such factual development as is necessary to determine whether defendants' operation of the landfill was subject to the proprietary function exception to governmental immunity. On the basis of the further factual development presented at that hearing, if the trial court determines that defendants' operation of the landfill *is* subject to the proprietary function exception to governmental immunity *as a matter of law*, then it should deny

[67] In *Delaney v Mich State Univ*, unpublished opinion per curiam of the Court of Appeals, issued March 16, 1999 (Docket No. 202391), in considering a motion brought under MCR 2.116(C)(7) and (C)(10), a panel of this Court concluded that the "plaintiff ha[d] submitted allegations and proofs sufficient to withstand [the] defendant's motion for summary disposition on the basis of governmental immunity." Accordingly, the panel reversed and remanded "for proceedings consistent with this opinion." However, the panel did not specifically indicate what such proceedings should actually entail, that is, a trial or merely an evidentiary hearing.

[68] *Laurence G Wolf*, 269 Mich App at 268; see also *Huron Tool & Engineering Co v Precision Consulting Servs*, 209 Mich App 365, 377; 532 NW2d 541 (1995) ("However, if a material factual dispute exists such that factual development could provide a basis for recovery, summary disposition is inappropriate.").

[69] *Hyde*, 426 Mich at 255.

defendants' summary disposition motion under MCR 2.116(C)(7) and proceed to trial on the substance of plaintiffs' claims. However, if the trial court determines that defendants' operation of the landfill is *not* subject to the proprietary function exception to governmental immunity *as a matter of law*, then the trial court should grant defendants' summary disposition motion under MCR 2.116(C)(7).

We affirm, but remand for proceedings consistent with this opinion. We do not retain jurisdiction.