# STATE OF MICHIGAN

# COURT OF APPEALS

MARY GLENN,

        Plaintiff-Appellee,

v

HURON-CLINTON METROPOLITAN
AUTHORITY,

        Defendant-Appellant.

UNPUBLISHED
November 21, 2017

No. 333940
Wayne Circuit Court
LC No. 15-008243-NO

Before: METER, P.J., and BORRELLO and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right a July 8, 2016, order denying its motion for summary disposition based on governmental immunity. We reverse.

On June 23, 2015, plaintiff filed a complaint for negligence against defendant, alleging that she fractured her ankle exiting a waterslide at the Turtle Cove Family Aquatic Center (TC) on July 18, 2014. Plaintiff claimed that TC was a "self-contained, self-functioning, for-profit waterpark," even though it was located within the boundaries of the Lower Huron Metropark (LHM) and even though defendant operated LHM.

Shortly after defendant answered, the parties sought, and the trial court entered, a stipulated order indicating that "the only possible exception to governmental immunity applicable to this case is the proprietary function exception to governmental immunity (MCL 691.1413), and if that exception does not apply in this case, immunity bars [p]laintiff's suit as a matter of law." MCL 691.1413 states:

> [I]mmunity of [a] governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees. No action shall be brought against the governmental agency for injury or property damage arising out of the operation of proprietary function, except for injury or loss suffered on or after July 1, 1965.

-1-

The parties agreed to limit discovery, initially, to facts or areas relating to the applicability of MCL 691.1413.

On March 31, 2016, defendant filed a motion for summary disposition under MCR 2.116(C)(7), (8), and (10). Defendant stated that for the proprietary function exception to apply, plaintiff needed to demonstrate that the activity in question (1) was conducted primarily for the purpose of producing a pecuniary profit and (2) was not normally supported by taxes or fees. Defendant alleged that TC is not operated primarily for the purpose of producing a pecuniary profit and is supported by taxes and admission fees.

Defendant attached numerous documents to its motion, and we will provide a brief overview of their contents. Rebecca Franchock, defendant's controller, testified at her deposition that property taxes from five counties accounted for approximately two-thirds of defendant's revenue and the remainder derived from fees and charges. Franchock stated, "We're governmental, so we're non-profit. We don't produce a profit." She then acknowledged, however, that if revenues exceeded expenditures, the excess "would drop into fund balance."

In answers to interrogatories, Franchock stated that revenue for TC, specifically, for fiscal years 2012, 2013, and 2014 was $802,266, $626,085, and $709,868, respectively. She further stated that expenditures for those years were $581,727.70, $626,306.75, and $595,357.65, respectively, and that depreciation for those years amounted to $260,232.92, $260,232.92, and $261,550.64, respectively.

Franchock testified that there was not and had never been a requirement that the money from defendant's general fund that was used to construct TC be replenished through the operation of TC. Franchock also testified that when TC sets its admission fees it does not take depreciation into account. She stated that even though "direct operating revenue" exceeded "direct operating expenditure" for some years, she would not characterize the excess as a "profit" because the expenditures did not include depreciation, payroll processing costs (which were incurred in a blended manner for employees of TC and other facilities), policing, maintenance of access roads, or budgeting and accounting costs. Franchock stated that she had never calculated the total of "indirect expenses" because "we're not operating it for a profit."

Franchock stated that defendant was anticipating having to take money from "fund balance" for 2016 because of various facilities that had "been neglected due to the decrease in tax revenues that the Metro Parks have received."

Franchock testified that TC was fenced and had an entry fee, and Jeffrey Schuman, the park operations manager for LHM, testified that it had different hours from LHM in general and did some separate advertising, but that TC employees, aside from the lifeguards, wear the same uniforms as other LHM employees. Franchock stated that "the fees and charges at all the [pool] facilities support the general operations" because "[t]he tax revenue isn't enough to build and operate them." She stated that revenues in excess of expenditures go "into fund balance and . . . support[] the whole park[.]" Schuman testified that the financial goal in operating TC was "to break even or not lose money on an annual basis." He stated that "[f]rom year to year, a surplus is hard to predict based on weather" and that a fee increase was proposed in 2013 because general expenses had gone up and it was believed that a fee increase would not affect attendance.

Schuman stated that another pool he oversees within defendant's park system consistently loses money. He stated that defendant's general fund was in existence to operate all the parks.

On June 24, 2016, plaintiff filed a response brief. Plaintiff alleged that the reports of TC's revenue, as indicated by deposition testimony, did not include car entry fees for vehicles entering LHM for the purpose of using TC,[1] food sales at TC, or revenue from locker rentals and sales of "sundries." Plaintiff claimed that the true revenue figures for 2012, 2013, and 2014 were $1,378,574, $1,083,005, and $1,125,951, respectively, basing this on 15-day revenue summary reports that she attached to her motion. Plaintiff also attached defendant's annual report, showing net revenue, for defendant as a whole, of approximately $2.3 million for 2015.

Plaintiff argued that depreciation should not be considered when considering the profitability of TC because depreciation is not taken into account when setting admission fees and because defendant does not "earmark the funds for replacement of [TC's] equipment in a separate fund . . . ."

Plaintiff argued that TC was being operated as a "cash cow" and therefore, defendant, in operating TC, was engaged in a proprietary function. Plaintiff stated: "[Defendant] is patently using its proprietary activity of operating a full-fledged waterpark to fund and underwrite the remainder of its activities, [build up] its general fund or for other purposes not disclosed. It certainly is not identifying the opportunity to decrease the admission charges to [TC]." Plaintiff stated that defendant's activity was "no different than Redford Township opening up a Starbucks and using the revenue to fund its other activities, and then [asking] the court to cloak its liability for the negligent operation of the Starbucks in governmental immunity." Plaintiff argued that TC is a licensed amusement park and differs in nature from governmental places like municipal pools, campgrounds, and the like.

Defendant filed a reply brief on June 28, 2016. In addition to countering case law cited by plaintiff, defendant attached an affidavit from Franchock in which she calculated revenues for 2012, 2013, and 2014 at $1,046,471.47, $820,004.02, and $894,533.61, respectively, taking into account food services, lockers, front-gate tolls, and sundries. She calculated expenses at $1,088,432.07, $1,119,771.15, and $1,074,250.07, respectively, taking into account expenses for the food service and sundries, depreciation, front-gate toll expenses, administrative expenses, and policing expenses.

Defendant argued that even though it has a $39.5 million dollar balance in its fund, the fund balance is the result of defendant's decision to defer certain capital expenditures and maintenance costs for various parks. Franchock supported this argument in her affidavit.

---

[1] This amount is not directly obtainable because patrons entering the park do not identify whether they are entering the park in order to attend TC. The parties did attempt to estimate the amount.

-3-

The motion hearing took place on June 30, 2016. The trial court ruled:

> When you look at the cases dealing with an effort to determine whether a particular function is either governmental or proprietary, I find it extremely difficult to reconcile them insofar as finding a consistency, a pattern or a path to determine what is clearly a governmental function or propriety function. I think there are two aspects these cases take. One is a function that is basically conducted to generate a profit. That's a clear case. It's probably not a clear case to prove, but the rule would be clear if it's a function that is intended to be operated for a profit and it's proprietary. The other test, is, per the cases, you look at the nature of the function. What it is, how it's operated, where it's located in determining whether or not it's a proprietary or governmental function. . . .
>
> I think genuine fact issues do exist.
>
> Was [TC] . . . specifically because of its configuration, the physical aspects and the nature of the function, was it intended to be self sufficient and to generate a profit? You go back to . . . when the original budget was formulated, et cetera.
>
> Secondly, using the other test that I glean from the cases and that is, you look at the nature of the function and how the function is carried out to determine whether it's proprietary or governmental. And I think you have a question of fact here considering how these things are done insofar as [TC] is concerned. By [its] very nature and how it's done, it is not a governmental function. It's simply a private -- a proprietary function, a function that is undertaken in the private world . . . .
>
> And it's for these reasons I believe that it would be improper for me to grant the motion. I'm not very comfortable with this whole state of the law, but as I view it, those are the genuine issues of fact that are necessary to resolve the profitability issue and the function issue as to whether it's proprietary or governmental . . . .

The court stated that after an appeal, "it could be the other way and vice versa, so sometimes it's better not to have a decision. It's better to take the road of reasonable settlement, so give it some thought." On July 8, 2016, the court entered an order denying defendant's motion "for the reasons stated on the record."

We review de novo a trial court's ruling regarding a motion for summary disposition. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). A defendant's motion for summary disposition pursuant to MCR 2.116(C)(10) tests the factual sufficiency of a plaintiff's complaint. *Joseph*, 491 Mich at 206. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. See *Smith v Globe Life Ins Co*, 460 Mich 446, 455 n 2; 597

-4-

NW2d 28 (1999), superseded in part on other grounds by statute as stated in *Dell v Citizens Ins Co of America*, 312 Mich App 734, 742; 880 NW2d 280 (2015). The moving party "must specify the issues for which it claims there is no genuine factual dispute. Provided the moving party's motion is properly supported, . . . the opposing party must then respond with affidavits or other evidentiary materials that show the existence of a genuine issue for trial." *Skinner v Square D Co*, 445 Mich 153, 160; 516 NW2d 475 (1994), overruled in part on other grounds by *Smith*, 460 Mich at 455 n 2. The court reviewing the motion

> must consider the affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion. If the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Joseph*, 491 Mich at 206 (citations omitted).]

"A motion for summary disposition brought under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the basis of the pleadings alone. The purpose of such a motion is to determine whether the plaintiff has stated a claim upon which relief can be granted. The motion should be granted if no factual development could possibly justify recovery." *Beaudrie v Henderson*, 465 Mich 124, 129-130; 631 NW2d 308 (2001).

Under MCR 2.116(C)(7), the court considers the "affidavits, pleadings, depositions, admissions, and other documentary evidence," and "[t]he contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *McLean v McElhaney*, 289 Mich App 592, 597; 789 NW2d 29 (2010) (quotation marks and citations omitted). "If the pleadings or documentary evidence reveal no genuine issues of material fact, the court must decide as a matter of law whether the claim is statutorily barred" because of governmental immunity. *Id*.

The parties do not dispute that this case centers on the applicability of MCL 691.1413, which states:

> [I]mmunity of [a] governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees. No action shall be brought against the governmental agency for injury or property damage arising out of the operation of proprietary function, except for injury or loss suffered on or after July 1, 1965.

In *Coleman v Kootsillas*, 456 Mich 615, 621; 575 NW2d 527 (1998), the Michigan Supreme Court stated that "the definition of a proprietary function is clear and unambiguous." Two tests must be satisfied for the exception to apply: "The activity (1) must be conducted primarily for the purpose of producing a pecuniary profit, and (2) it cannot be normally supported by taxes and fees." *Id*.

Two considerations should be taken into account "[i]n determining whether the agency's primary purpose is to produce a pecuniary profit . . . ." *Id*. The first is whether a profit is actually generated; the *Coleman* Court noted that if an activity consistently generates a profit, this may be evidence of an intent to produce a profit. *Id*. However, "whether an activity actually generates a profit is not dispositive . . . ." *Herman v Detroit*, 261 Mich App 141, 145; 680 NW2d 71 (2004). The second consideration involves where any profit generated is deposited and how it is spent. *Coleman*, 456 Mich at 621. The *Coleman* Court stated that "[if] the profit is deposited in the government agency's general fund or used to finance unrelated functions, this could indicate that the activity at issue was intended to be a general revenue-raising device. If the revenue is used only to pay current and long-range expenses involved in operating the activity, this could indicate that the primary purpose of the activity was not to produce a pecuniary profit." *Id*. at 621-622 (quotation marks and citations omitted).

The proprietary-function exception "does not penalize a governmental agency's legitimate desire to conduct an activity on a self-sustaining basis." *Dextrom v Wexford Co*, 287 Mich App 406, 422; 789 NW2d 211 (2010) (quotation marks and citation omitted). In other words, the availability of immunity does not depend solely on accounting ledgers. *Id*.

In analyzing whether defendant's primary purpose in operating TC was to generate a pecuniary profit, we find it helpful to review *Coleman* and *Dextrom*. In *Coleman*, 456 Mich at 622, the activity at issue was the operation of a landfill. In concluding that the primary purpose of the operation was to produce a pecuniary profit,[2] the Court noted that "from 1982 through 1990, the landfill consistently generated a substantial profit, ultimately exceeding seven million dollars." *Id*. The Court also noted that the profit was used to fund projects such as an expansion of a fire hall and to fund the city library and city ski hill, among other things. *Id*. In addition, the landfill revenue actually resulted in a drop in millage rates. *Id*. After ruling against the governmental agency, the *Coleman* Court stated:

> This opinion should not be read to change the way courts should interpret the exceptions to governmental immunity. They are to be narrowly construed. This is an unusual case, one in which the government has chosen to run a commercial enterprise for the purpose of reaping a pecuniary profit. Because of the breadth of the enterprise, this case is of the type that the proprietary function statute intended to address, even when the exception is given a narrow construction. [*Id*. at 624-625 n 11.]

*Dextrom*, 287 Mich App at 421, also involved the operation of a landfill. In concluding that the trial court did not err in finding a question of material fact regarding the pecuniary purpose of the landfill, the Court first noted that the landfill had been making a profit since 1984, with assets increasing from $948,894 to $13,710,372 between 1989 and 2000. *Id*. at 423. The Court also noted that, between 2000 and 2005, "substantial sums were transferred out of the landfill fund to finance unrelated projects." *Id*. at 424. Finally, the Court emphasized that the

---

[2] The governmental agency had conceded this point but the Court nevertheless analyzed it. *Coleman*, 456 Mich at 622 n 5.

plaintiffs had "cite[d] numerous instances of county officials making statements that indicate a profit-making motive." *Id*. at 424.

As noted in *Coleman*, 456 Mich at 624-625 n 11, we must construe the propriety function exception narrowly. Reading *Coleman* and *Dextrom* in conjunction with the documentary evidence produced below in the present case, we conclude that there is no genuine issue of material fact regarding whether defendant operates TC primarily for the purpose of producing a pecuniary profit; it does not.

Plaintiff spends much time in her appellate brief discussing the inclusion of front-gate toll expenses in the calculation of TC's profits, but the more significant argument relates to the depreciation expenses. Defendant's controller, responsible for its financial records, testified that to obtain an accurate value for TC's profits, depreciation must be taken into account. Plaintiff contends that because defendant does not use depreciation in calculating its fees, it is not proper to include depreciation in the calculation of profit. It also contends that "[i]n order for depreciation to be utilized for [TC], [defendant] would also have to earmark the funds for replacement of [TC's] equipment in a separate fund, which they do not." Significantly, plaintiff does not support these bald assertions, in contrast to the deposition testimony of a financial specialist who testified that depreciation must be considered in calculating profits because, otherwise, profit-and-loss statements would be skewed, with some years showing no expenses for replacement or repair of an asset and some years showing large expenses. Plaintiff also argues that depreciation cannot be considered because MCL 691.1413 uses the term "pecuniary profit," not "accounting or financial profit," but Franchock identified depreciation as a "cost" of operation.

Any "profit" of TC's identified by plaintiff is reduced when depreciation is properly accounted for. Any profit that did exist went into defendant's general fund. It is true that in *Coleman*, 456 Mich at 621, the Court stated that "[i]f the profit is deposited in the government agency's general fund or used to finance unrelated functions, this could indicate that the activity at issue was intended to be a general revenue-raising device." (Quotation marks and citation omitted.) However, in *Coleman*, the profits were diverted from landfill activities to things such as a fire hall and a library. *Id*. at 622. Here, any profits are put into a general *park* fund; this is different, because the activities at issue (a waterpark versus parks in general) are similar. In addition, revenue from TC did not result in a drop in millage rates. Cf. *id*.

In *Dextrom*, like in *Coleman*, profits were transferred from the landfill fund to "unrelated projects." *Dextrom*, 287 Mich App at 424. Here, any profits that were transferred to defendant's general fund were used for related activities.

Franchock testified that she never had to calculate the total of indirect expenses for operating TC because the government was not operating it for a profit, and Schuman testified that the financial goal in operating TC was "to break even or not lose money on an annual basis." Plaintiff insists that the large balance in defendant's account, combined with evidence that a rate increase for TC was going to be sought, is evidence that TC was being operated for pecuniary purposes. But Franchock averred that the balance was "the result of [defendant's] decision to defer capital expenditures and large maintenance costs."

In considering the facts of this case and comparing it to existing case law, we simply cannot find that plaintiff has raised a genuine issue of material fact regarding whether defendant operates TC primarily for the purpose of producing a pecuniary profit.[3]

With regard to the issue of whether the activity at issue is "normally supported by taxes and fees," MCL 691.1413, the *Coleman* Court stated:

> When deciding whether an activity satisfies the second part of the proprietary function test, it is important to consider the type of activity under examination. In this case, it is more than the operation of a municipal landfill. It is the operation of a commercial landfill that accepts garbage, not merely from the city of Riverview, but from communities as distant as Ontario, Canada. An enterprise of such vast and lucrative scope is simply not normally supported by a community the size of the city of Riverview either through taxes or fees.
>
> The fact that the city charges fees to garbage haulers unloading refuse into its landfill does not alter this conclusion. Any governmental activity must exact a fee if it is to produce a pecuniary profit. If imposition of a use fee like Riverview's would suffice to defeat the proprietary function exception to governmental immunity, almost no city activity would subject a city to liability. That could not have been the intention of the Legislature. [*Coleman*, 456 Mich at 622-623.]

The Court stated that "it does not matter if the landfill is actually supported by taxes or fees." *Id*. at 622 n 8.

The operation of a city or county waterpark is not unusual and is something normally supported by taxes and fees. In fact, TC *is* supported by taxes and fees. Thus, even though we need not reach the second prong of the proprietary function analysis, we note that it, too, supports defendant's position.

Reversed and remanded for entry of judgment in favor of defendant. We do not retain jurisdiction.

/s/ Patrick M. Meter
/s/ Stephen L. Borrello
/s/ Michael J. Riordan

---

[3] We acknowledge that in *Rohrabaugh v Huron-Clinton Metropolitan Authority Corp*, 75 Mich App 677, 687-688; 256 NW2d 240 (1977), the Court found the operation of a roller-skating rink within a park to be a proprietary function. We decline to rely on *Rohrabaugh* because, in that case, the Court relied solely on the nature of the facility, see *id*., whereas in *Coleman* the Supreme Court laid out a much more comprehensive test for determining when the propriety-function exception applies. We note that we are not bound by *Rohrabaugh* under MCR 7.215(J)(1).