# STATE OF MICHIGAN

# COURT OF APPEALS

NANCY A KRUPP, d/b/a Antor Travel Agency,

        Plaintiff-Appellee,

v

LIGHTHOUSE FULL LIFE CENTER CHURCH,
and PRAISE PLACE MINISTRIES, LLC,

        Defendants,

and

MARVIN SAPP,

        Defendant-Appellant.

UNPUBLISHED
May 9, 2017

No. 332659
Kent Circuit Court
LC No. 15-03029-CK

Before: WILDER, P.J., and BOONSTRA and O'BRIEN, JJ.

PER CURIAM.

Defendant Marvin Sapp (Sapp) appeals by right the trial court's order granting partial summary disposition in favor of plaintiff on its breach of contract claims against Sapp,[1] denying defendants' motion for summary disposition, dismissing plaintiff's claims against the other defendants without prejudice, and entering a judgment against Sapp in the amount of $26,234.52. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Sapp is a professional gospel singer and preacher. He is also the founder of defendant Lighthouse Full Life Center Church (Lighthouse). Sapp described defendant Praise Place Ministries, LLC (Praise Place) as a company that received payments for his "ministry events" as

---

[1] Plaintiff pled both a breach of express contract claim and a breach of implied contract claim against Sapp.

-1-

well as "some music stuff," and that paid salaries to Sapp, his assistant Shilantha Jones, and other subcontractors.[2]

In May 2014, Sapp, through his booking agent, Lone Oak Entertainment (Lone Oak), entered into a written contract (hereinafter "Concert Agreement") with Black Sunshine Media Events (Black Sunshine) to perform at a venue in Durban, South Africa in November 2014. Sapp was to be paid $28,000 as recited under the heading *Compensation*. The Concert Agreement additionally obligated Black Sunshine, under the heading *Ancillary Items*, to provide certain additional items, including the following:

**Travel:** 10 Round Trip Airfares (1 Business Class & 9 coach tickets) per rider requirements + all ground transportation

The Concert Agreement additionally provided as follows:

2. [Black Sunshine] must coordinate the travel arrangements for Pastor Sapp with Kristin Ruiter at Antor Travel, (616)-866-3500. **Failure to do so shall result in [Black Sunshine] paying for all changes made to [Sapp] travel arrangements for the said engagement.**

The Concert Agreement thus did not obligate Black Sunshine to independently contract to purchase airline tickets,[3] or even to provide Sapp with airline tickets that it would purchase. Rather, it obligated Black Sunshine to "coordinate" with plaintiff for Sapp's travel, and it obligated Black Sunshine to provide Sapp the "[a]irfares" specified. "Airfare" is the "fare for transportation by airplane." *Random House Webster's College Dictionary* (2005). "Fare" is simply "the price of conveyance or passage" on a carrier. *Id*. The Concert Agreement thus expressly contemplated that Sapp was responsible for acquiring the tickets, and obligated Black Sunshine to compensate him for the price of the tickets. The agreement further provided that if Black Sunshine failed to provide any of the items or compensation required by the agreement, Sapp had no obligation to perform under the agreement and Black Sunshine would "remain liable to [Sapp] for the compensation provided in this agreement." *Id*.

Jones testified at her deposition that Jody Mainello, an employee of Lone Oak, "brought" the South Africa event to Sapp and negotiated the Concert Agreement on Sapp's behalf, although Jones lacked specific knowledge of those negotiations. She then testified in general regarding the nature of her dealings with plaintiff relative to making arrangements for Sapp's business travel, and described her contacts with Kristin Ruiter, an employee of plaintiff, as follows:

---

[2] Plaintiff's amended complaint added Praise Place as a defendant, and also added a claim for breach of implied contract against Praise Place.

[3] Indeed, and without deciding whether Black Sunshine was independently obligated to plaintiff under an oral or implied contract, the record reflects no express written contract between them.

-2-

Okay. I send [Ruiter] a monthly calendar, and the monthly calendar lists the date of the event, the location of the event, meaning the city, and the state, and the time, and it also has the contact person's name, number, and e-mail address. She would then start sending me flight options from whatever location [Sapp] was coming from, where he's going to, and then I would approve the flight options that contain the city, time, and date, and then she contacts the promotor or organization that is requesting him for the event, which is the contact person on the calendar.

Jones also testified generally regarding the process for arranging and paying for Sapp's business travel. Specifically, Praise Place would sometimes pay for travel arrangements if a promotor or organization had already provided the funds for travel in advance; in other words, it appears that at least sometimes the promotor or organization would simply provide funds to Sapp's LLC for his travel and would not involve itself any further in travel arrangements. Jones testified that Sapp's Delta SkyMiles Rewards account was linked to the tickets booked through this process and that she would check the SkyMiles account to confirm that the tickets had been purchased.

Jones, Ruiter and Sapp all testified to Sapp's "rule," which, in essence, can be summed up as, "if they don't pay then I don't fly." Sapp further testified that Jones only arranged his personal travel, and that a promotor or organization that wanted him to perform would contact his booking company, as indeed Black Sunshine did, to negotiate terms. Sapp testified that Jones merely provided his schedule to plaintiff and was later notified of the travel arrangements so that she could adjust his calendar. However, as stated, Jones testified that she approved the flights; in fact, she testified that she would sometimes inform Ruiter about a particular flight that Sapp preferred.

In an email dated September 1, 2014, Jones provided plaintiff with details regarding Sapp's upcoming trip to South Africa, including contact information for a representative of Black Sunshine. Ruiter testified that she communicated with Jones about who would be travelling with Sapp and the relevant dates, and that she spoke with representatives of Black Sunshine regarding payment for the tickets. Extensive back-and-forth emails between Jones and Ruiter ensued regarding flight options. Several related to inquiries from Jones concerning the availability of a first-class seat for Sapp on the flights.[4] The emails culminated in Jones' approval of the selected flights.

A representative of Black Sunshine provided Ruiter a "Credit Card Authorization" form and a credit card number to pay for the flights that Jones had approved. Ruiter used the credit

---

[4] We note that the Concert Agreement provides for airfare for 9 "coach" tickets one "business class" ticket, which is generally a different class of ticket than first class. The record does not contain evidence indicating whether business class seats were in fact available on the flights in question.

card number to purchase the tickets and informed Jones and Mainello that the tickets had been purchased. Jones confirmed the purchase by checking Sapp's SkyMiles account.

Sapp and his bandmates flew to South Africa and performed the concert. After the tickets had been used, Ruiter received a "debit memo" from Delta Airlines indicating that the credit card payment from Black Sunshine's credit card had been declined "due to invalid or no approval code." Delta ultimately charged plaintiff the amount stated above. Plaintiff at first attempted to recover the funds from Black Sunshine. Black Sunshine did not reimburse plaintiff.

Plaintiff filed suit. Its amended complaint asserted claims for breach of contract against all defendants, for unjust enrichment and breach of implied contract against Sapp, and for breach of implied contract against Praise Place. Discovery, including the depositions of Sapp, Jones, and Ruiter, ensued. In December 2015, the parties filed cross-motions for summary disposition.[5]

Following a hearing on the parties' cross-motions, the trial court granted plaintiff's motion for partial summary disposition and denied defendants' motion. The trial court stated in relevant part:

> Here, it seems clearly [sic] that the plaintiff initiated the – or the defendant initiated the contact with the plaintiff by seeking to have flights booked for the South African venture in the usual fashion by way of a – a calendar and a contact from Shilantha Jones. It seems that the conversations viewed against the backdrop of the prior course of conduct and dealing between the parties indicates that the plaintiff and defendant had a contract, where both parties agree the plaintiff would book the plane tickets, and the defendant – and the defendant would arrange for payment principally through a third party. Now, this is the objective and reasonable interpretation of the exchange between the parties. The plaintiff booked the plane tickets, and the defendant received and used them, but although he put the plaintiff in touch with Black Sunshine, ultimately failed to arrange payment for them. Therefore, the simple understanding is that the defendant breached the contract. And the fact that the defendant elected to pay using a third party's credit card does not alter the arrangement between the plaintiff and defendant. . . . .

The trial court also noted that it was Sapp who initiated contact with plaintiff to arrange travel to South Africa, that Sapp made decisions concerning whether to fly coach or first class, and that Sapp used his SkyMiles account. The trial court issued the order described above. The trial court denied defendants' motion for reconsideration. This appeal from Sapp followed. Lighthouse and Praise Place are not parties to this appeal.

---

[5] Although plaintiff's motion was entitled a motion for summary disposition, it actually only sought partial summary disposition with respect to Count II (breach of contract by Sapp) or in the alternative Count V (breach of implied contract by Sapp) (the first of two counts apparently inadvertently labeled "Count V," the second of which was against Praise Place).

## II. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition. *Moser v Detroit*, 284 Mich App 536, 538; 772 NW2d 823 (2009). Summary disposition is proper under MCR 2.116(C)(10) if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). We consider the affidavits, pleadings, depositions, admissions, and other documentary evidence in the light most favorable to the nonmoving party. *Liparoto Constr, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 29; 772 NW2d 801 (2009). All reasonable inferences are to be drawn in favor of the nonmovant. *Dextrom v Wexford County*, 287 Mich App 406, 415; 789 NW2d 211 (2010). If it appears that the opposing party is entitled to judgment, the court may render judgment in favor of the opposing party. MCR 2.116(I)(2); *Bd of Trustees of Policemen & Firemen Retirement Sys v Detroit*, 270 Mich App 74, 77-78; 714 NW2d 658 (2006). A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

Additionally, we review de novo as a question of law the trial court's conclusion that a contract exists. *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006).

## III. EXISTENCE OF CONTRACT

Sapp argues that the trial court erred by concluding that an express or implied contract existed between plaintiff and Sapp. We disagree.

"In Michigan, the essential elements of a valid contract are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Thomas v Leja*, 187 Mich App 418, 422; 468 NW2d 58 (1991). The parties may "explicitly manifest their intent to contract by words [or] their intent may be gathered by implication from their conduct, language, and other circumstances attending the transaction." *Featherston v Steinhoff*, 226 Mich App 584, 589; 575 NW2d 6 (1997). Mutual assent to form a contract, i.e. a "meeting of the minds," is determined objectively from the parties' express words and visible acts. *Kamalnath v Mercy Mem Hosp Corp*, 194 Mich App 543, 548-549; 487 NW2d 499 (1992).

Sapp does not challenge the parties' competency to contract or the subject matter of the contract. And although Sapp argues that plaintiff never made an offer to him, the record shows that Sapp, through Jones,[6] approached plaintiff seeking to obtain plane tickets to South Africa for

---

[6] Sapp has not challenged Jones's actual or apparent authority to bind him to a contract as his agent. In light of the testimony from all parties concerning the past dealings between Jones and plaintiff, we conclude that Jones at least possessed the apparent authority to so bind Sapp as her principal. See *Meretta v Peach*, 195 Mich App 695, 699; 491 NW2d 278 (1992).

certain dates by sending Sapp's calendar and engaging in further communication with plaintiff about the tickets. A reasonable person would interpret this as an invitation to offer plane tickets to South Africa for purchase by Sapp, including for the payment of plaintiff's fees for arranging the ticket purchase. Ruiter in fact did so, and Sapp, through Jones, accepted the offer for the specific flights in question by approving the flights (after Sapp requested and received an upgrade to first-class seating). Further, all deponents testified that this was a common method by which tickets were obtained for Sapp's singing and preaching engagements. Jones testified that this procedure was also used in cases where payment was not arranged directly between plaintiff and a third-party, in which case the tickets were instead paid for by Praise Place. The interactions between Ruiter and Jones and their "prior communications coupled with the circumstances surrounding the bargain," *Patrick v US Tangible Investment Corp*, 234 Mich App 541, 548; 595 NW2d 162 (1999), convince us that the trial court did not err by concluding that an offer and acceptance occurred between plaintiff and Sapp.

Sapp also argues that there was no legal consideration. We disagree. Consideration is a bargained-for exchange; there must be a benefit to one side or a detriment suffered or service done on the other. *Innovation Ventures v Liquid Manufacturing*, 499 Mich 491, 508; 885 NW2d 861 (2016). Lack of consideration relates to the adequacy of consideration at the time of the contract's formation. *Id*. Here, Sapp accepted plaintiff's offer of tickets to South Africa and provided contact information for the third-party payer who was to pay for the tickets and for plaintiff's services. Plaintiff in fact received credit card authorization after communicating with representatives of Black Sunshine, although the payment method ultimately failed and resulted in plaintiff being charged by Delta. The fact that payment to plaintiff was to be made through a third party does not void the contract for lack of consideration. See *Levitz v Capitol Savings & Loan Co*, 267 Mich 92, 96-97; 255 NW 166 (1934).

Further, although Sapp argues that no contract could have been formed because Jones was not informed of the price of the tickets, a contract may be implied when "one engages or accepts beneficial services of another for which compensation is customarily made and naturally anticipated, and, although there be no express stipulation between the parties for wages or price, the law implies an understanding or intent to pay the value of the services rendered." *Miller v Stevens*, 224 Mich 626, 632; 195 NW 481 (1923); see also *Rocco v Mich Dep't of Mental Health*, 114 Mich App 792, 799-800; 319 NW2d 674 (1982). Here, Sapp and Jones were fully aware that plaintiff was offering a service for compensation, and although Sapp may not have cared about the price of the tickets when he expected Black Sunshine to pay, Sapp, through his agent Jones, nonetheless accepted the services of plaintiff and undertook the obligation to pay plaintiff for the tickets and plaintiff's service fee. Again, Jones testified that the past dealings between Sapp and plaintiff did not solely involve tickets being paid for by promotors or organizations that had engaged Sapp's services; sometimes Sapp paid for the tickets directly through one of his companies.

In sum, we conclude that, even viewed in the light most favorable to Sapp, the evidence presented to the trial court shows that no genuine issue of material fact exists regarding the existence of a contract between Sapp and plaintiff for the purchase of airline tickets to South

Africa. MCR 2.116(C)(10); *Kloian*, 273 Mich App at 452.[7] We therefore do not need to address the parties' arguments concerning unjust enrichment. See *Belle Isle Grill Corp v Detroit*, 256 Mich 463, 478; 666 NW2d 271 (2003) (noting that unjust enrichment claims will not lie when a contract exists that covers the same subject matter).[8]

## IV. FAILURE TO MITIGATE DAMAGES

Finally, Sapp argues that the trial court erred by entering judgment in favor of plaintiff, on the ground that plaintiff failed to mitigate its damages. We disagree.

Failure to mitigate damages is an affirmative defense; a defendant bears the burden of proving that a plaintiff failed to make "reasonable efforts" to avoid or minimize its damages. See *Morris v Clawson Tank Co*, 459 Mich 256, 263-264; 587 NW2d 253 (1998). A plaintiff is not required to make all efforts to eliminate economic damages resulting from a defendant's wrongdoing, but only efforts that are reasonable under the circumstances. See *id*. "[T]he claimant's burden is not onerous, and does not require him to be successful in mitigation." *Id*. (quotation marks and citations omitted; alteration in original).

Here, although Ruiter indicated that she did not contact the credit card company that issued Black Sunshine's credit card, she testified to her understanding that another employee of plaintiff had done so, that he had also contacted Delta, and that he had made phone calls to several people involved regarding the debit memo that plaintiff had received from Delta. Additionally, she recalled that she had emailed Jones, Mainello, and employees of Black Sunshine concerning the debit memo. Emails presented to Ruiter at her deposition reflected that plaintiff was working with "Brian" from Black Sunshine to secure payment for the tickets. Despite their ultimate lack of success, these efforts on the part of plaintiff to mitigate its damages suffice to meet its non-onerous burden. *Morris*, 459 Mich at 263-264.

Affirmed. As the prevailing party, plaintiff may tax costs. MCR 7.219(A)(1).

/s/ Kurtis T. Wilder
/s/ Mark T. Boonstra
/s/ Colleen A. O'Brien

---

[7] We note that, notwithstanding his liability to plaintiff, nothing in this opinion prevents Sapp from pursuing a remedy against Black Sunshine for breach of the Concert Agreement or any other claims arising from the contractual relationship between Sapp and Black Sunshine.

[8] We note, however, that irrespective of the trial court's oral commentary regarding unjust enrichment, its summary disposition order found that claim to be moot. A court speaks through its written orders. *In re Contempt of Henry*, 282 Mich App 656, 679; 765 NW2d 44 (2009).