# STATE OF MICHIGAN

# COURT OF APPEALS

DAVID R. SANDERS and HEATHER H.
SANDERS,

Plaintiffs-Appellants,

v

TUMBLEWEED SALOON, INC.,[1] and PAINTER
INVESTMENTS, INC., doing business as
CHAUNCEY'S PUB,

Defendants-Appellees,

and

SHAWN SPOHN and ZACHARY PIERCE,

Defendants.

UNPUBLISHED
October 30, 2018

No. 338937
Montmorency Circuit Court
LC No. 16-003949-NO

Before: RONAYNE KRAUSE, P.J., and GLEICHER and LETICA, JJ.

GLEICHER, J. (*dissenting*).

The issue presented is whether plaintiffs David and Heather Sanders entered into an attorney-client relationship with Samuel Meklir for the purpose of pursuing a claim under the dramshop act. The majority highlights various evidentiary discrepancies that surfaced after defendants Tumbleweed Saloon and Chauncey's Pub challenged the timeliness of plaintiffs' notice of their claim, and concludes that further fact-finding is required.

The existence (or nonexistence) of an attorney-client relationship is a legal question driven by facts. No material facts remain in dispute. Further factual development is unnecessary, as reasonable minds could not differ regarding the existence or the scope of the parties' attorney-client relationship. I respectfully dissent.

---

[1] Tumbleweed is also known as the "Highway Bar" and the "Hi Way."

-1-

## I

The dramshop act, MCL 436.1801 *et seq.*, governs claims alleging "negligent furnishing, selling, or giving away of liquor." *Millross v Plum Hollow Golf Club*, 429 Mich 178, 189; 413 NW2d 17 (1987). One provision of the act requires a plaintiff contemplating an action against a retail licensee to "give written notice to all defendants within 120 days after entering an attorney-client relationship for the purpose of pursuing a claim under this section." MCL 436.1801(4). Plaintiffs provided written notice of their intent to file claims against the Tumbleweed Saloon and Chauncey's Bar more than 120 days after consulting with Meklir. The drinking establishments were awarded summary disposition based on their contention that plaintiffs' meeting with Meklir triggered the running of the notice period.

The majority is certainly correct that when reviewing a summary disposition motion brought under MCR 2.116(C)(10), we must consider the evidence in the light most favorable to the nonmoving party, refrain from making our own factual findings, and credit the nonmovants with the benefit of all reasonable and supportive inferences flowing from the evidence. But this is not a run-of-the-mill (C)(10) motion, which asserts that the moving party is entitled to judgment as a matter of law. Rather, defendants' motion for summary disposition presents a preliminary legal question: did plaintiffs enter into an attorney-client relationship with Meklir for the purpose of pursuing a claim under the dramshop act? Like other preliminary legal questions—for example, whether a governmental entity is entitled to immunity—facts underlie the legal inquiry. Preliminary legal issues are usually resolved by judges, not juries. When material facts relevant to a preliminary legal question are in dispute, the trial judge resolves the factual questions after an evidentiary hearing. See *Dextrom v Wexford Co*, 287 Mich App 406, 431-432; 789 NW2d 211 (2010).[2] If no material facts are in dispute, "or if reasonable minds cannot differ regarding the legal effect of the facts," a preliminary legal question is strictly one of law. *Willett v Waterford Charter Twp*, 271 Mich App 38, 45; 718 NW2d 386 (2006) (cleaned up).[3] Whether plaintiffs formed an attorney-client relationship with Meklir for the purpose of pursuing a dramshop act claim is a preliminary legal question capable of resolution by the court.

The circuit court has already considered the evidence the majority proposes for reconsideration (or expansion) at an evidentiary hearing. After reviewing the presuit letter Meklir sent to Tumbleweed, Meklir's postsuit affidavit, and plaintiffs' deposition testimonies, the trial court concluded that an attorney-client relationship existed when Meklir sent the letter. The court did not clearly err in resolving this legal question. I perceive no need for further fact finding, as the material evidence supports only one additional, interrelated conclusion: that

---

[2] The majority does not make it clear whether the additional fact-finding it orders is to be made by the judge or a jury.

[3] This opinion uses the new parenthetical (cleaned up) to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

Meklir knew or should have known that plaintiffs had a potential dramshop action when he met with them at his office.

II

The facts *material* to the existence and scope of plaintiffs' attorney-client relationship with Meklir are either not in dispute, or correctly were deemed immaterial by the trial court. The majority expounds on several *immaterial* facts, such as David Sanders's denial of having seen Meklir's letter. I recapitulate the material facts in full because they demonstrate that the trial court got it right

Plaintiff David Sanders was badly beaten by two men. Viewed in the light most favorable to David, the evidence supports that his assailants were visibly intoxicated at the time they were served alcohol in defendant dramshops. David learned the names of the men who attacked him within a few days after the beating.

About two months later, David and Heather Sanders consulted attorney Samuel Meklir, a specialist in personal injury litigation, in Meklir's Southfield office. After his meeting with the Sanders, Meklir wrote the following letter to the Tumbleweed Saloon:

> Please be advised that *I represent Mr. David Sanders as a result of injuries he sustained while at the Highway Bar which occurred on December 2, 2014.*
>
> I understand that you have a videotaping system that would have recorded the activities, which occurred and during which, Mr. Sanders was injured.
>
> We believe that the video evidence, which is in your possession, would be critically important.
>
> We would ask that the tapes, discs, or digital storing device the events are kept on, be preserved and not subject to spoliation.
>
> *Our firm would be willing to view the information at your convenience.*
>
> I thank you in advance for your cooperation. [Emphasis added.]

Here is David's deposition testimony regarding his consultation with Meklir:

*Q.* . . . But this firm that is representing you now is not the first firm you hired, is it?

*A.* I'm not sure.

*Q.* Didn't you hire a firm down in Southfield?

*A.* Yeah. They're the ones that recommended these guys.

*Q.* Okay. Who is the firm *you hired* down in Southfield?

*A*. That I couldn't tell you at this point in time. I don't recall.

*Q*. Maybe I can.

*A*. Oh, it was - -

*Q*. Sommers Schwartz, wasn't it?

*A*. Yes.

*Q*. And you hired Samuel Meklir, didn't you?

*A*. Samuel Meklir is the one that referred us to that - - to him yes.

*Q*. But you retained Samuel Meklir initially?

*A*. I didn't retain - - I didn't retain him. I didn't sign no papers with him. I didn't retain nothing with him.

*Q*. You never retained him?

*A*. No. I talked to him, but that was it.

*Q*. Well, he wrote a letter to Tumbleweed saying that you had retained him to pursue a case against Tumbleweed. Are you aware of that?

*A*. I didn't - - no; I'm not aware of that, no.

*Q*. Do you dispute that - - do you dispute Mr. Meklir - - Attorney Meklir, that you did not retain him?

*A*. I did not - - not that I'm aware of we did not retain him. I don't recall signing any papers with him. I remember going down and seeing him, and he said not to sign any papers at this time.

* * *

*A*. I didn't - - yeah. I didn't - - I didn't hire him. I didn't sign no papers with Mr. Meklir.

*Q*. Okay. But you were not injured at the Tumbleweed Bar, were you?

*A*. No.

*Q*. How did he learn that; do you know?

*A*. I told you I went down and seen Mr. Meklir. I talked to Mr. Meklir, but I did not sign any papers with him.

*Q.* What did you tell him?

*A.* I explained what happened to him; what - - the whole situation happened there.

*Q.* What did you tell him specifically?

*A.* I don't remember what I told him specifically, to be honest with you.

*Q.* You don't?

*A.* No, I don't.

*Q.* How did you learn his name?

*A.* He's my wife's lawyer.

*Q.* Heather?

*A.* Heather.

Here is Heather Sanders's testimony regarding the same meeting:

*Q.* Okay. Is Mr. Meklir the one . . . that represented you . . . through your daughter in the birth case?

*A.* Yes.

*Q.* Okay. And did you and David retain him to help you out in this case?

*A.* We basically worked our way up here. He showed us where to go, who to see.

*Q.* But you initially went to see him; right?

*A.* Yes.

*Q.* Did you retain him?

*A.* No.

*Q.* Okay. Do you know why Mr. Meklir would have written a letter to the Tumbleweed saying that he was retained by - - by you and David?

*A. We went in to see him to get things going and all that, but when he looked at the case it wasn't - - the travel time and him taking the time up here wasn't worth - -*

*Q. Wasn't worth it for him?*

*A.* *Yeah.*

*Q.* Well, do you know why he would say that - - why he would write a letter indicating that you had retained him?

*A.* I probably - -

*Q.* Have you seen the letter?

*A.* He probably did. I just don't recall at the time.

* * *

*Q.* Yeah, the "Please be advised that I represent Mr. Sanders", do you see that?

*A.* Okay.

*Q.* Yeah. Do you dispute that?

*A.* No.

*Q.* Okay. Do you see anything else in the letter that, to your knowledge is glaringly inaccurate?

*A.* There is no video evidence that we have. [Emphasis added.]

After the bars filed motions for summary disposition, Meklir signed an affidavit averring in relevant part:

5. Following our conversations, I informed the Sanders that I would not be taking the case or representing them.

6. As a favor, I sent a letter regarding the preservation of security tapes.

7. No retainer agreement was ever drafted or signed regarding this incident.

8. At no time did I ever represent the Sanders regarding the personal injury claim that involved the assault on Mr. Sanders.

David Sanders testified that he "explained what happened . . . the whole situation . . ." during his meeting with Meklir. Meklir knew that the Sanders had consulted him regarding a "personal injury claim that involved the assault on Mr. Sanders" at a bar. This evidence establishes that plaintiffs shared with Meklir the facts detailed in the majority opinion, including Spohn's behavior at Chauncey's after his alcohol supply had been curtailed. David Sanders never disavowed that Meklir represented him, at least initially, with regard to this claim:

-6-

*Q*. Yeah, the "Please be advised that I represent Mr. Sanders", do you see that?

*A*. Okay.

*Q*. Yeah. Do you dispute that?

*A*. No.

*Q*. Okay. Do you see anything else in the letter that, to your knowledge is glaringly inaccurate?

*A*. There is no video evidence that we have.

These are the material facts. They support only one reasonable conclusion: plaintiffs entered into an attorney-client relationship with Meklir for the purpose of pursuing a dramshop claim. The circuit court expressly determined that during their meeting in Southfield, plaintiffs had an attorney-client relationship with Meklir, and implicitly found that their meeting was for the purpose of pursuing a claim under the dramshop act. I discern no clear or legal error.

III

A few preliminary points bear mention. First, no formal contract is required to create an attorney-client relationship. Rather, "[t]he employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in matters pertinent to his profession." *Macomb Co Taxpayers Ass'n v L'Anse Creuse Pub Sch*, 455 Mich 1, 11; 564 NW2d 457 (1997), citing 7 Am Jur 2d, Attorneys at Law, §118, pp 187-188. That Meklir was not formally retained is irrelevant.

Second, Meklir did not need plaintiffs' permission to send the letter. In writing to one of the drinking establishments, Meklir acted as an agent for plaintiffs. His authority to act on their behalf was not limited to what they may have expressly authorized him to do. According to *Slocum v Littlefield Pub Sch Bd of Ed*, 127 Mich App 183, 194; 338 NW2d 907 (1983):

> Agents have the implied power to carry out all acts necessary in executing the principal's expressly conferred authority. Whether the act in question is within the authority granted depends upon the act's usual or necessary connection to accomplishing the purpose of the agency. [*Id*. (cleaned up).]

For example, the "authority to act on behalf of a principal may include the ability to undertake acts necessary to ensure service and to provide notice." *Russell v Detroit*, 321 Mich App 628, 641; 909 NW2d 507 (2017). Therefore, plaintiffs' claim that they did not specifically authorize Meklir to send the letter is irrelevant.

Third, most of the averments in Meklir's self-serving affidavit are also immaterial. Whether *Meklir* thought he had formed an attorney-client relationship with plaintiffs does not matter. "In determining whether an attorney-client relationship exists, . . . the focus is on the *client's* subjective belief that he is consulting a lawyer in the lawyer's professional capacity and

-7-

his intent is to seek professional legal advice." *Grace v Ctr for Auto Safety*, 72 F3d 1236, 1242 (CA 6, 1996) (cleaned up). Meklir's post-hoc statements that he sent the letter as "a favor" and that he did not "represent" plaintiffs, do not refute that plaintiffs visited him not to engage in idle chit-chat, but to obtain legal advice. Thus, the facts that (1) plaintiffs and Meklir had no retainer agreement, (2) plaintiffs did not specifically or expressly authorize Meklir to write to Tumbleweed, and (3) Meklir ultimately decided to decline representation due to time or location constraints, are not facts material to the legal question at the heart of defendants' summary disposition motion.

The majority highlights that Meklir's post-lawsuit affidavit demonstrates that he and plaintiffs never reached a "meeting of the minds" regarding representation and posits that his letter stating otherwise should be ignored. Despite claiming to represent David Sanders in that letter and in the same breath requesting access to video evidence, Meklir's affidavit asserts the opposite—that he actually refused to represent plaintiffs after meeting with them. Meklir's dodging and weaving does not create a *material* fact question regarding the legal issue at the heart of this dispute. When considering the material evidence, reasonable minds could not differ as to the ultimate conclusion that as a matter of law, Meklir and plaintiffs entered into an attorney-client relationship for the purpose of pursing a dramshop action.

The majority rejects that Meklir's letter evidences an attorney-client relationship, insisting that unlike the "testimonial" evidence Meklir provided in his affidavit, the letter is consistent with "carelessness or a unilateral act." That is a stretch, in my view. And the trial court agreed when it decided to reject the averment. As the finder of preliminary facts relevant to legal determinations, the trial court's view prevails unless it is clearly erroneous. It is not.

Meklir's affidavit does not state that he acted "carelessly" or "unilaterally" in declaring that he "represented" plaintiffs and sought video evidence on their behalf. The majority permits Meklir to contradict and disavow the statement in his letter, holding that the circuit court must accept Meklir's affidavit and disregard the letter. Abundant Michigan caselaw holds that a witness may not create a factual dispute by submitting an affidavit that contradicts his prior testimony. See *Dykes v William Beaumont Hosp*, 246 Mich App 471, 480; 633 NW2d 440 (2001). It follows that a question of fact cannot be created by an affidavit completely at odds with a witness's recorded words, whether sworn or not—particularly when the sworn testimony offers no explanation for the prior statement. The trial court reached the same conclusion.

But in the end, it does not matter. Even disregarding the "I represent" statement, the evidence establishes that plaintiffs met with Meklir for the purpose of pursuing a dramshop claim. When plaintiffs consulted Meklir, all three knew that David Sanders had been beaten by two intoxicated men who were served alcohol at the Tumbleweed and Chauncey's. During their depositions plaintiffs did not claim to have met with Meklir to discuss an auto accident or a medical malpractice case or anything else. They told him the story, and Meklir wrote a letter seeking evidence to corroborate it. Plaintiffs' awareness of these facts suffices to create a presumption that they consulted Meklir to discuss a potential dramshop claim, and none of the evidence undercuts or weakens this presumption. Nothing more is necessary to satisfy the statute.

-8-

This is not the first case in which parties have disputed whether an initial meeting with counsel was for the purpose of pursuing a dramshop claim, starting the 120-day clock. One such case reached the Supreme Court, which spelled out the guiding legal precepts in a brief order. The majority attempts to distinguish *Langrill v Stingers Lounge*, 471 Mich 926; 689 NW2d 228 (2004), but I find the effort unconvincing.

*Langrill* arose from an auto accident. *Langrill v Stingers Lounge*, 261 Mich App 698, 699; 683 NW2d 225 (2004). The defendant driver pleaded guilty to operating a motor vehicle while under the influence of liquor. *Id*. at 700 n 1. The plaintiff sued the driver and obtained a large default judgment. *Id*. at 700. The plaintiff then notified Stingers of her intent to file a dramshop action, and amended her complaint to add this claim. The trial court granted summary disposition to Stingers because the plaintiff's notice was sent beyond the 120-day period. *Id*. This Court reversed, observing that the plaintiff's "retainer agreement expressly stated that she retained her attorney for the purpose of an auto negligence claim, not a dramshop action." *Id*. at 702.

The Supreme Court vacated this Court's order, remanding to the trial court for further proceedings. *Langrill*, 471 Mich at 926. The Court explained that "[b]ecause plaintiff did not present any evidence to the contrary, there is a presumption that the attorney-client relationship she entered into with her first attorney, who filed the original complaint in this matter, included the purpose of pursuing a claim under MCL 436.801." *Id*. The Supreme Court directed the trial court to grant summary disposition to the defendant if the court found that "sufficient information for determining that defendant might be liable under MCL 436.1801" was known or reasonably could have been known "within 120 days of the beginning of that first attorney-client relationship." *Id*.[4]

*Langrill* is on-point. Meklir's letter stated that Meklir "represent[ed]" David "as a result of injuries he sustained while at the Highway Bar[.]" Let's assume that Meklir inadvertently used the term "represent," and join the majority in ignoring it. The balance of Meklir's letter demonstrates that he either understood that a dramshop action was possible, or should have reached that realization. Meklir's request for preservation of video evidence of the events *inside* the bar strongly supports the former, as the video would potentially provide evidence that David's assailants were visibly impaired when they were served alcohol. There was no other reason to obtain the videotape. But regardless, Meklir *should* have known that a dramshop action was an option assuming the evidence supported it, and that is enough under *Langrill*.

---

[4] This holding places on the consulted *attorney* an obligation to be aware of the elements of a dramshop claim and the notice requirement. Under different circumstances, a potential plaintiff may not know that a potential defendant was intoxicated or had been served alcohol while visibly impaired. Theoretically, this information could emerge only during discovery. In those circumstances, the attorney would have no obligation to provide notice at the time of the first consultation. Here, however, the individual defendants' inebriation and the involvement of the drinking establishments were known from the outset.

Plaintiffs' testimonies further buttress the presumption that their attorney-client relationship with Meklir was for the purpose of pursuing a dramshop claim. Neither plaintiff mentioned another reason for the consultation. David admitted that he "explained what happened" to Meklir: "the whole situation [that] happened there." Heather recalled that she and her husband "went in to see [Meklir] to get things going and all that," and that Meklir "showed us where to go, who to see." Plaintiffs met with Meklir because Meklir is a lawyer and they wanted legal advice. Meklir not only gave them advice; he took an action on their behalf.

This evidence is consistent with only one reasonable and material inference: Meklir had sufficient information to understand that plaintiffs had a potential cause of action under the dramshop act. Whether Meklir intended to represent plaintiffs for the long-haul is really beside the point. He had a relationship with them of attorney and client during a meeting about a dramshop claim. I would affirm the circuit court.


/s/ Elizabeth L. Gleicher

-10-