*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF CHRISTINA RUTH REIKOWSKY,
by GENE A. REIKOWSKY, JR., Personal
Representative,

       Plaintiff-Appellant,

v

COVENANT MEDICAL CENTER, INC., doing
business as COVENANT HEALTHCARE,

       Defendant-Appellee.

UNPUBLISHED
June 4, 2020

No. 347427
Saginaw Circuit Court
LC No. 17-032117-NO

Before: RONAYNE KRAUSE, P.J., and SERVITTO and REDFORD, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's order granting defendant's motion for summary disposition in this premises liability and wrongful-death action. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On July 21, 2015, the decedent was struck by an automatic sliding door while exiting defendant's healthcare facility. The decedent broke her hip, for which she underwent surgery, and also received a laceration to her head. In July 2016, the decedent, who was 88 years of age, passed away due to cardiorespiratory arrest resulting from congestive heart failure. Plaintiff brought this wrongful death and premises liability action alleging that the automatic door constituted a dangerous condition; that defendant had been aware of this for many years leading up to the accident; and that the decedent's death was caused by health complications resulting from, or exacerbated by, the accident.

Testimony from various door technicians and experts established the following description of the door in question and its sensor technology. The door appears to have been installed in the early 1990s, and it contained older sensor technology in the form of an "Eagle" and "Stanguard" sensor system. The Eagle sensor was a motion detection sensor, and the Stanguard sensor was a presence detection sensor located above the door. The Eagle sensor would detect a person's movement, resulting in the door opening; the Stanguard sensor would prevent the door from

closing if it detected a person's presence within the doorway. Once the door began to close, the Stanguard sensor would turn off, meaning it could no longer detect a person within the doorway. At the time of the accident, a newer sensor, the "Wizard" sensor, was available. The Wizard would not turn off when the door began to shut, which meant that it would always monitor a doorway. The Wizard sensor was in turn replaced by the even newer "Ixio" sensor, which is a combined motion and detection sensor that has the additional safety feature of keeping the door open in the event of a malfunction or defect. The older sensors lacked this feature. However, the Eagle, Stanguard, and Wizard sensors are still widely used today.

At the time of the accident, defendant's door contained the older Eagle and Stanguard sensor systems. Various technicians who serviced the door in the years leading up to the accident informed defendant on multiple occasions that it should upgrade to the newer sensors. Industry standards created by the American National Standards Institute (ANSI) recommended that the newer Wizard and Ixio sensors be used, and defendant was made aware of this by the door technicians. Plaintiff's position is that, because the door's older sensors lacked the safety features of the newer sensors, this made the door a dangerous condition because it could close on a person, such as the decedent; moreover, given that defendant was aware of this in the years leading up to the accident, it had actual notice of the door's potential issues.[1] Critically, however, plaintiff has provided no evidence that any of the service technicians, or indeed anyone else, ever told defendant that the door was *dangerous*. In fact, the technician upon whom plaintiff primarily relies explained that he was required to sell upgrades, so he simply recommended them as a matter of course; and if he believed a door was dangerous, he was required to deactivate it.

Defendant moved for summary disposition pursuant to MCR 2.116(C)(10), arguing that plaintiff had failed to demonstrate that the door constituted a dangerous condition and/or that defendant had breached its duty regarding this alleged dangerous condition. Defendant alternatively argued for partial summary disposition concerning plaintiff's wrongful death claim, contending that plaintiff had failed to connect the decedent's death to the accident from a year earlier. The trial court agreed with defendant, ruling that defendant was entitled to summary disposition on liability grounds and, alternatively, that defendant was entitled to partial summary disposition on the wrongful death claim. This appeal followed.

## II. STANDARD OF REVIEW

We review de novo the trial court's decision on a motion for summary disposition. *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2d 211 (2010). A motion is properly granted pursuant to MCR 2.116(C)(10) when "there is no genuine issue with respect to any material fact and the moving party is entitled to judgment as a matter of law." *Id*. at 415. Upon review, we "must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact

---

[1] Plaintiff specifically denies contending that the door was dangerous purely because the door used older technology, but as we will discuss, the record does not support plaintiff's contention that defendant was made aware of any problem with the door other than its use of older technology.

exists. A question of fact exists when reasonable minds could differ as to the conclusions to be drawn from the evidence." *Id*. at 415-416.

## III. PREMISES LIABILITY

To succeed in a premises liability action, the party "must prove (1) that the defendant owed a duty to the plaintiff, (2) that the defendant breached the duty, (3) that the defendant's breach of the duty caused the plaintiff's injuries, and (4) that the plaintiff suffered damages." *Kennedy v Great Atlantic & Pacific Tea Co*, 274 Mich App 710, 712; 737 NW2d 179 (2007). "A premises owner breaches its duty of care when it 'knows or should know of a dangerous condition on the premises of which the invitee is unaware and fails to fix the defect, guard against the defect, or warn the invitee of the defect.' " *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 8; 890 NW2d 344 (2016), quoting *Hoffner v Lanctoe*, 492 Mich 450, 460; 821 NW2d 88 (2012).

The evidence establishes a question of fact whether defendant was aware that the sensor equipment installed on its door was no longer state-of-the-art, and that newer sensors had better safety features. However, the evidence does not establish any question of fact whether defendant was, or should have been, aware that the door was actually defective or dangerous. Premises are not *per se* rendered defective or dangerous simply because some aspect of the site is obsolete and an upgrade to state-of-the-art technology or design would have made the site safer. *Reardon v Dep't of Mental Health*, 430 Mich 398, 416-417; 424 NW2d 248 (1988); *Hickey v Zezulka*, 440 Mich 408, 424; 487 NW2d 106 (1992). Thus, we decline to hold that simple noncompliance with a "best practices" guideline or a mere recommendation from a standards-promulgation organization such as ANSI is sufficient to communicate the presence of a defect or danger.

Plaintiff relies on a single, vague, and out-of-context statement by one of the service technicians for the proposition that defendant knew the door was dangerous. The technician explained that his employer required him to sell upgrades, so those upgrades were almost always recommended, but the upgrades were seldom purchased due to their costs. In that context, the following exchange occurred:

> *Q*. You'd agree with me, though, that the upgrade provided additional technology that the old systems didn't have. Right?
>
> *A*. Correct.
>
> *Q*. That's why they call it an upgrade. Right?
>
> *A*. Right. We push the safety fact. You know, you could have a lawsuit. Oh, my god, forbid that would happen.
>
> *Q*. When you say a safety fact you mean part of the reason they were suggesting an upgrade is that the upgraded sensors were safer than the old sensors.
>
> *A*. Right. Correct.

The technician also explained that part of his service involved performing tests on the doors, and if the door was actually unsafe, he was required to shut the door down and turn it off completely.

He also agreed that a door was not out of compliance just because there was a recommended upgrade.[2]

Thus, the only evidence that defendant was on notice that the doors might be unsafe is a vague assertion that defendant was informed that the doors could have been made *safer*. This in and of itself did nothing to indicate to defendant that the door was a dangerous condition. The Eagle and Stanguard sensors continue to be widely used. The technicians, although recommending an upgrade, gave no indication that the door was dangerous or malfunctioning. In fact, several worksheets explicitly provide that the door was working properly. Moreover, after the accident occurred, a technician was called out to examine the door. His worksheet provides that the door was working properly and "met code." Additionally, plaintiff's expert appeared to agree that the newer sensor technology did not necessarily make the older sensor technology defective or dangerous. Thus, the evidence shows that as far as defendant could have known, the door was old but was working properly.

We therefore conclude that, irrespective of whether the door actually was dangerous or actually did malfunction, the evidence fails to show that defendant was on notice of any such possible defect or danger. The trial court correctly granted summary disposition in favor of defendant as to plaintiff's premises liability claim.

## IV. WRONGFUL DEATH

Plaintiff also appeals the trial court's dismissal of the wrongful death claim. Plaintiff argues primarily that the dismissal was procedurally improper, because the issue of dismissing the wrongful death claim had not yet been properly raised or argued, and in fact the parties had agreed to adjourn the issue. The trial court dismissed the wrongful death claim because plaintiff presented no evidence specifically linking the death to the accident. Plaintiff contends that the trial court erred because a deposition from plaintiff's treating physician remained pending, and the medical literature shows that the injuries plaintiff sustained are correlated with an increased mortality rate. We need not address either argument.

"Wrongful death" is not a truly independent cause of action, but rather permits another underlying claim and theory of liability to survive a person's death. See *Ballard v Southwest Detroit Hosp*, 119 Mich App 814, 817-819; 327 NW2d 370 (1982); *Hawkins v Regional Medical Labs, PC*, 415 Mich 420, 428-438; 329 NW2d 729 (1982). Because the trial court properly dismissed plaintiff's premises liability claim, and plaintiff has not articulated any alternative theory of liability, plaintiff necessarily cannot maintain a wrongful death claim. If the trial court arrived

---

[2] Plaintiff argues another technician explained that without the sensor upgrade, a slow-moving person might be caught by the door closing. However, the technician never said anything about slow-moving persons. Rather, the technician agreed that the Wizard sensor would make it less likely for a door to close on somebody. In any event, the technician did not indicate that he communicated any danger to defendant or any of defendant's agents.

-4-

at the right result, we generally need not inquire into whether the trial court did so for the wrong reasons. *Fox v Roethlisberger*, 350 Mich 1, 4; 85 NW2d 73 (1957).

Affirmed.

/s/ Amy Ronayne Krause
/s/ Deborah A. Servitto
/s/ James Robert Redford