*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* DONALD F. CLARK TRUST.

---

ELAINE D. CLARK,

      Appellant,

v

MICHAEL A. MOONEY,

      Appellee.

UNPUBLISHED
January 20, 2022

No. 355300
Iosco Probate Court
LC No. 18-003656-TV

---

Before: CAMERON, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

Petitioner-appellant, Elaine D. Clark, appeals by right the probate court's order denying her motion for summary disposition under MCR 2.116(C)(10) and denying her petitions to return real property and bank account funds. We affirm for the reasons stated in this opinion.

## I. BASIC FACTS

This is the second time that this case is before us. In our prior decision, we described the general background for this case:

> On November 29, 2017, Donald F. Clark ("Settlor") created a noncharitable, irrevocable trust [the Trust] to provide for the benefit and welfare of himself and his wife, appellant Elaine D. Clark. The trust named respondent[, Michael A. Mooney,] as trustee and provided that he would have the sole discretion to distribute any trust income or principal to the beneficiaries. Elaine was the primary beneficiary, and upon her death, her son, appellant Donald L. Clark, would become the sole beneficiary. On Donald L. Clark's death, if the trust had not been completely distributed, the remainder would be distributed to respondent. Settlor died on December 9, 2017. On March 22, 2018, the probate court removed respondent from his position as trustee to avoid a conflict of interest. [*In re Donald*

-1-

*F Clark Trust*, unpublished per curiam opinion of the Court of Appeals, issued February 20, 2020 (Docket No. 346539), p 1.]

During the decedent's life and after the Trust's creation, funds from two jointly held PNC bank accounts were transferred into the Trust. Additionally, petitioner met with the decedent's lawyer, Robert Myles, and signed deeds transferring real property into the Trust. Petitioner disputes these transfers and filed petitions to have the funds and property returned to her, arguing that she did not understand what she was doing when she transferred the real property and that respondent improperly transferred the PNC accounts for his own benefit.

Petitioner moved for summary disposition under MCR 2.116(C)(10) only as it related to the PNC accounts. However, the probate court denied the motion, finding that there was a genuine issue of material fact regarding whether the decedent desired that the the funds to pass to petitioner upon his death or whether he desired for those funds to be placed within the Trust and paid out to petitioner to care for her after his death. Additionally, after an evidentiary hearing held on the same day, the trial court found that petitioner had failed to show that the transfers—of real property and the funds in the PNC accounts—should be voided, so it denied the petition to return real property and the petition to return the funds from the PNC accounts.

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

Petitioner argues that the trial court erred by denying her motion for summary disposition as it relates to the PNC accounts. "This Court reviews de novo a trial court's decision on a motion for summary disposition, as well as questions of statutory interpretation and the construction and application of court rules." *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2d 211 (2010). A motion is properly granted under MCR 2.116(C)(10) when "there is no genuine issue with respect to any material fact and the moving party is entitled to judgment as a matter of law." *Id*. at 415. When reviewing such a motion, "a court must examine the documentary evidence presented and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists. A question of fact exists when reasonable minds could differ as to the conclusions to be drawn from the evidence." *Id*. at 415-416. "This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

### B. ANALYSIS

Petitioner argues that under MCL 487.703, a joint bank account with a deposit was prima facie evidence of the depositor's intention to vest title in the survivor. Thus, because she and the decedent created the PNC accounts in 2006 with rights of survivorship and deposited funds into the accounts, there is no genuine issue concerning whether the decedent intended for the funds to pass to petitioner upon his death. MCL 487.703 provides in relevant part:

> When a deposit has been made, or shall hereafter be made, in any banking institution transacting business in this state, in the names of 2 or more persons, payable to either or the survivor or survivors, such deposit or any part thereof or

any interest or dividend thereon and any additions thereto, made by any 1 of the said persons, shall become the property of such persons as joint tenants, and the same shall be held for the exclusive use of the persons so named and may be paid to any 1 of said persons during the lifetime of said persons or to the survivor or survivors after the death of 1 of them, and such payment and the receipt or acquittance of the same to whom such payment is made shall be a valid and sufficient release and discharge to said banking institution for all payments made on account of such deposits prior to the receipt by said bank of notice in writing not to pay such deposit in accordance with the terms thereof.

The making of the deposit in such form shall, in the absence of fraud or undue influence, be prima facie evidence, in any action or proceeding, to which either such banking institution or surviving depositor or depositors is a party, of the intention of such depositors to vest title to such deposit and the additions thereto in such survivor or survivors.

This statute shields a banking institution from liability "for any withdrawal of funds made by a co-owner of the account, at least in the absence of prior written notice that withdrawals are not permitted." *Lewis Estate v Rosebrook*, 329 Mich App 85, 88; 941 NW2d 74 (2019). However, this does not "serve as a sword for the withdrawing co-owner to pierce the nonwithdrawing co-owner's rights. Instead, the withdrawing co-owner must take the funds from the account *as a co-owner* and, therefore, must use the funds in a manner consistent with the other co-owner's rights." *Id*.

MCL 487.703 "provides two primary rights—a right of proportional share of the funds in the account and a right of survivorship." *Id*. at 95. However, "parties, by their words or deeds, can agree to put conditions or restrictions on the account, for example, by expressing an intent that the funds are to be held merely for the convenience of the depositor or are otherwise subject to revocation at the sole discretion of the depositor." *Id*. Although "the law presumes that joint tenants are equal contributors, have equal ownership shares, and have equal rights to access and use the funds," this "presumption can be rebutted . . . and this is a question of fact subject to clear-error review on appeal." *Id*. at 96. The form of the account does not control; rather, it is the "realities of ownership" that "control in a dispute between parties to the joint tenancy," and "[t]he rights are determined by the intent of the depositor at the time of the deposit." *Id*. at 96-97 (quotation marks omitted).

In *Lewis Estate*, 329 Mich App at 88, the parties owned three joint bank accounts with the right of survivorship, and both parties held equal rights in the accounts. This Court explained the nature of the parties' relationship and use of these accounts:

Carol Rosebrook and Lewis were a couple for approximately 24 years, living and socializing together, though they never married. They had several joint and individual financial accounts, three of which are relevant here. In 2001, 2003, and 2009, the parties opened joint accounts with the right of survivorship at Old Kent Bank (later Fifth Third Bank) and Sidney State Bank. All three accounts were funded primarily, if not exclusively, by Lewis. The couple used the funds to pay their ordinary day-to-day expenses, sometimes consulting each other and

sometimes not, depending on the nature and amount of the expense. As the probate court concluded, "In all respects these accounts were held and used equally by both parties."

> Lewis was diagnosed with a serious illness in 2013, and in October 2016, he moved into a care facility. The couple ended their relationship in late January 2017, and they agreed to a 30-day period to sort out their affairs. Immediately after the split, Lewis and his daughter went to Fifth Third Bank and asked that the bank "freeze" the joint accounts. They maintain that they were told that the accounts could not be "frozen," and they left the bank without withdrawing any funds or closing the accounts.
>
> Over the next two weeks, Rosebrook transferred approximately $255,000 from the three accounts to accounts solely in her own name; this total represented substantially all of the funds in the three accounts. At the time, she was a cotrustee of the Robert G. Lewis, Sr., Trust. Rosebrook also had the power to act on Lewis's financial behalf under a durable power of attorney ["the DPOA"]. Lewis did not authorize or otherwise agree to the transfers, nor did he even know that the funds had been removed until he went to one of the banks and tried to access an account. [*Id*. at 89-90.]

This Court held that this transfer was unlawful because Rosebrook "acted in her own personal capacity, rather than in her capacity as a co-owner in the joint tenancy[.]" *Id*. at 89. In doing so, this Court reasoned that the evidence showed that Lewis did not "intend[] to convey a 100% interest in the funds to Rosebrook or that he intended to divest himself of all ownership interest in the funds during his lifetime." *Id*. at 99. Though this Court explained that the statute permitted a joint owner to withdraw the entirety of a joint account, "the right to access is just one in the bundle of rights to funds in a joint account." *Id*. at 101.

> The record reflects that the parties had established a practice over the years that each party could access and use funds in the accounts without consulting the other party, at least with respect to all but the most costly expenses. The record further shows that some of the uses were for mutual expenses and some were for personal expenses. Yet, this tacit agreement to forgo prior consultation on particular expenses does not clearly encompass, or even remotely suggest, an additional agreement that one party could access and appropriate the entire corpus of the accounts for that party's own use, while the other, nonwithdrawing party would disclaim any interest in the corpus. In other words, there is nothing in this record to suggest that Lewis and Rosebrook ever agreed, by word or deed, that one of the parties could transfer all of the funds out of the three accounts and appropriate those funds for that party's personal use without concern for the other party. Therefore, if Rosebrook had the right to appropriate the entire corpus for her own use without regard to Lewis as a co-owner of the joint tenancy, then this right would have to exist by operation of statute or common law rather than by any established agreement of the parties. [*Id*. at 102.]

Examining the statute, this Court concluded that it did not shield an owner who withdrew funds from liability to the other nonwithdrawing owner. *Id*. at 103. This Court similarly found that the common law supported the same conclusion. *Id*. at 103-104. However, this Court conceded that "[p]rior cases have recognized that a depositor may, under certain circumstances, withdraw all of the funds and revoke a joint account during the depositor's lifetime." *Id*. at 105. Therefore, this Court held that, "although the probate court correctly recognized that Rosebrook had the right to withdraw all of the funds in the three accounts, the probate court erred by conflating the right to withdraw with the right to retain and use the funds for her own benefit despite Lewis's co-ownership rights." *Id*. at 106-107.

In this case, the probate court found that there was a genuine issue of material fact regarding the realities of ownership between the decedent and petitioner. Determining the realities of ownership is an intensive factual inquiry that will depend on the facts of each case. Petitioner's affidavit showed that the decedent handled *all* of their marital finances and gave petitioner money whenever she needed it. The decedent took care of petitioner, and petitioner was largely unaware of their assets or financial status; in fact, she claimed to be unaware of the Trust or DPOA altogether. This is much different than the situation in *Lewis* in which the ownership was more equal.

This evidence, submitted by petitioner herself, raised questions regarding the realities of ownership. The court was concerned with whether transferring the PNC account funds to the Trust was in keeping with how the parties had treated those accounts during their lives and whether distributing small amounts of the accounts to petitioner through the Trust was essentially no different. Contrary to petitioner's position, establishing prima facie evidence from the accounts' creation and deposit was not the end of the discussion; this evidence could be rebutted, see *Lewis Estate*, 329 Mich App at 96, and petitioner's affidavit provided a possibility of this. Petitioner contended that the realities of ownership were such that decedent desired for petitioner to have the funds entirely to herself; however, there was a question of fact on this contention because the decedent's and petitioner's conduct during their marriage was evidence of a *different* reality of ownership than that put forth by petitioner in her motion for summary disposition. We discern no error with the probate court's decision to have the facts "more flushed [sic] out" in the evidentiary hearing.

## III. HEARSAY

### A. STANDARD OF REVIEW

Petitioner next argues that the trial court erred by admitting hearsay testimony during the evidentiary hearing. This Court reviews for an abuse of discretion the trial court's decision to admit evidence. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). The trial court abuses its discretion when it "chooses an outcome falling outside the range of principled outcomes." *Id*.

### B. ANALYSIS

Hearsay is defined as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

MRE 801(c). A statement is not hearsay if it is "of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." MRE 803(3).

Myles, the decedent's lawyer, testified that he, the decedent, and respondent went to the PNC bank after executing the Trust and DPOA. Petitioner's lawyer objected on hearsay grounds. In response, the probate court stated:

> I'm going to let him testify to what happened on that date. I guess I'll *not consider the truth of the statement*. But if he's *stating that [the decedent] was there*, then I'm going to allow it." [Emphasis added.]

Myles testified about the trip to the PNC bank, including that the manager met with the decedent and discussed the Trust and DPOA. Similarly, Myles testified that he discussed the DPOA with the decedent and that the decedent was comfortable with giving respondent that level of power. The decedent trusted respondent "100 percent to handle his financial affairs." Petitioner objected again on hearsay grounds, but the probate court stated that the transactions with the decedent were admissible and that there was no "jury here to be confused." The probate court distinguished the *transaction* testimony from the testimony of the *decedent's specific statements*, which were hearsay. Finally, respondent testified that the decedent "wanted to make sure [petitioner] was taken care of. That she would have enough money to live the rest of her life on. And he wanted to make sure that [petitioner and the decedent's son] couldn't get access to that money that they put in the Trust." The probate court again allowed the testimony over petitioner's objections.

Petitioner has failed to show that the probate court considered any inadmissible hearsay. The complained of testimony addressed the visit to the PNC bank and the decedent's attitude toward respondent and not specific statements uttered by the decedent. To the extent that any specific statements were testified about, the probate court made clear that it was not considering *statements* made by the decedent but, rather, the *events* and *circumstances* that witnesses testified about. The probate court's opinion did not rely on any statements that the decedent made.

Moreover, petitioner has failed to show that the probate court relied exclusively on the complained of testimony. Petitioner's position is that, except for the improper testimony, there was no other evidence for the probate court to rely on. That is incorrect. The probate court based its finding and ruling on the visit to the PNC bank; the decedent and petitioner's conduct during their marriage; and the fact that the Trust was established for petitioner's benefit and, therefore, the withdrawn funds were not for respondent's personal use. This formed the basis for why the court concluded that the realities of ownership did not change such that the withdrawal from the accounts was unlawful.

## IV. REAL PROPERTY

## A. STANDARD OF REVIEW

Petitioner argues that the trial court erred by denying her petition to return the real property to her. "This Court reviews for clear error the probate court's factual findings and reviews de novo its legal conclusions." *Lewis Estate*, 329 Mich App at 93 (quotation marks and citation omitted). Clear error occurs "when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Id.* (quotation marks and citation omitted). This Court will "defer to the probate court on matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court." *Id.* (quotation marks and citation omitted).

## B. ANALYSIS

The probate court did not clearly err by denying petitioner's petition to return the real property. The test for mental capacity was put forth decades ago by our Supreme Court:

> [W]hether at the time he executed the deeds in question he had sufficient mental capacity to understand the business in which he was engaged, to know and understand the extent and value of his property, and how he wanted to dispose of it, and to keep these facts in his mind long enough to plan and effect the conveyances in question without prompting and interference from others. [*Barret v Swisher*, 324 Mich 638, 641; 37 NW2d 655 (1949) (quotation marks and citation omitted).]

In the present case, the probate court held that it was not persuaded that the decedent and petitioner "didn't discuss the matter and that she didn't know exactly why she went to the attorney's office to sign documents." It reasoned that petitioner did not remember why she met with Myles to sign the documents, that she either had not read the documents or did not remember reading them or what they contained, and that Myles did not remember the transaction and did not discuss the documents with petitioner. The court found no basis to void the transfers on the basis of petitioner's evidence.

There was sufficient evidence to support these findings and conclusions. Though petitioner may wish to retry this issue on appeal, the standard of review is not de novo but clear error. Petitioner's testimony showed that her memory was extremely poor. She did not remember her affidavit or recognize her signature, and she did not even recognize or remember writing checks shown to her. She also testified that she "didn't pay much attention to a lot of things." Petitioner testified that, *to her recollection*, nobody explained to her what the paper that she signed was. However, she clarified that Myles "might have, *I just might have forgot*, you know." The probate court's findings were not clearly erroneous because it was within its prevue to credit or discredit petitioner's claims that she did not know what she signed. See *Lewis Estate*, 329 Mich App at 93. On the basis of her testimony, the probate court had evidence to support the finding that petitioner *did* know what she had signed and the effects of it but simply did not remember. There was no evidence of undue influence or interference from others, and there is no indication that respondent

was present or involved to exert undue influence. Furthermore, petitioner's poor memory and testimony supported the finding that petitioner did not meet her burden to show why the transfers should be voided.

Affirmed. Respondent may tax costs as the prevailing party. MCR 7.219(A).

/s/ Thomas C. Cameron
/s/ Michael J. Kelly
/s/ Douglas B. Shapiro