*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DERIO WINCONEK,

Plaintiff-Appellant,

v

MICHIGAN HEALTHCARE PROFESSIONALS,
PC, COMPREHENSIVE UROLOGY, and
MUZAMMIL AHMED, M.D.,

Defendants-Appellees,

and

SZAS, LLC,

Defendant.

UNPUBLISHED
November 18, 2025
2:59 PM

No. 372742
Wayne Circuit Court
LC No. 22-011579-NH

Before: REDFORD, P.J., and CAMERON and PATEL, JJ.

PER CURIAM.

In this medical-malpractice action, plaintiff, Derio Winconek, appeals as of right the trial court's order granting summary disposition in favor of defendants pursuant to MCR 2.116(C)(7) (immunity granted by law). We reverse.

## I. BACKGROUND

In April 2020, plaintiff began seeing defendant Dr. Muzammil Ahmed, a urologist and physician licensed to practice medicine, at Comprehensive Urology in Westland, Michigan. Plaintiff, who was 68 at the time and had a history of prostate cancer in his family, sought treatment from Dr. Ahmed for urine retention. On April 1, 2020, Dr. Ahmed performed an ultrasound on plaintiff, which showed that he had an enlarged prostate. In the same month, Dr. Ahmed performed a cystoscopy to examine the lining of plaintiff's bladder. After reviewing the findings from these procedures, Dr. Ahmed recommended that plaintiff increase use of the medication Flomax and scheduled him for a procedure to remove overgrown prostate tissue. Dr. Ahmed also calculated

-1-

plaintiff's predictive prostate-specific antigen level to be 7.98.[1]  However, Dr. Ahmed did not order a blood test to assess plaintiff's PSA level at that time.

Over the next several months, plaintiff continued to see Dr. Ahmed.  Dr. Ahmed performed several procedures on plaintiff, who continued to have symptoms of urine retention and an enlarged prostate.  Plaintiff alleged that no PSA testing was ordered or performed while he was treated by Dr. Ahmed.  In April 2021, plaintiff underwent an MRI and back surgery after he started experiencing severe back pain.  Testing related to this surgery showed positive results for the growth of tumor cells.  Ultimately in May 2021, plaintiff was diagnosed with metastatic prostate cancer.

In September 2022, plaintiff filed a complaint for medical malpractice against defendants, alleging that Dr Ahmed failed to timely diagnose his prostate cancer, and that delay diminished his chances of being cured and surviving because the undiagnosed prostate cancer metastasized and spread to other parts of his body during the time he was being treated by Dr. Ahmed.  In the complaint, plaintiff alleged that Dr. Ahmed failed to properly assess, diagnose, and treat him when he presented for evaluation starting in April 2020, including failing to assess his PSA levels and performing a biopsy to rule out cancer.  Plaintiff attached an affidavit of merit to his complaint from Dr. Matthew E. Karlovsky, a licensed urologist, who averred that plaintiff had a meritorious claim of medical malpractice against defendants for failing to timely diagnose his cancer.  During a deposition, Dr. Karlovsky testified that plaintiff already had prostate cancer in April 2020 and, had Dr. Ahmed properly diagnosed plaintiff with cancer at that time, the cancer likely would have been confined to the prostate.

After the parties engaged in discovery, defendants moved for summary disposition under MCR 2.116(C)(7), arguing that they were immune from plaintiff's suit under Michigan's Pandemic Health Care Immunity Act ("PHCIA"), MCL 691.1417 *et seq*.  In response, plaintiff argued that the immunity conferred by the PHCIA was inapplicable to defendants because the healthcare services plaintiff sought from defendants was for urological issues unrelated to the coronavirus ("COVID-19") pandemic.  The trial court initially denied defendants' motion for summary disposition, but later granted the motion on reconsideration after determining that it was bound to dismiss plaintiff's complaint in accordance with this Court's decision in *Franklin v McLaren Flint*, ___ Mich App ___; ___ NW3d ___ (2024) (Docket No. 366226).  This appeal followed.

---

[1] A prostate-specific antigen ("PSA") blood test is used to screen for prostate cancer by testing the amount of PSA, a type of protein, in an individual's blood.  Higher levels of PSA may indicate the presence of prostate cancer.  See Mayo Clinic, *PSA Test* <https://www.mayoclinic.org/tests-procedures/psa-test/about/pac-20384731> (accessed August 25, 2025).  According to Dr. Ahmed's deposition testimony, a predictive PSA is the number range calculated based on the volume of the individual patient's prostate to be considered a normal PSA range for that particular patient.

## II. STANDARD OF REVIEW

This Court reviews de novo a decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A trial court may grant summary disposition under MCR 2.116(C)(7) on the basis of immunity granted by law. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008). Under MCR 2.116(C)(7), a reviewing court "must accept all well-pleaded factual allegations as true" and construe them in the light most favorable to the nonmoving party, unless other evidence contradicts them. *Dextrom v Wexford Co*, 287 Mich App 406, 428; 789 NW2d 211 (2010). The reviewing court must consider any affidavits, depositions, or other documentary evidence to determine if there is a genuine issue of material fact. *Id*. at 429. "If no facts are in dispute, and if reasonable minds could not differ regarding the legal effect of those facts, the question whether the claim is barred is an issue of law for the court." *Id*. Matters of statutory interpretation are also reviewed de novo. *Odom*, 482 Mich at 467.

## III. ANALYSIS

Plaintiff argues the trial court erred by determining defendants were immune from litigation because plaintiff's claims do not arise from services that defendants provided in support of the state's response to the COVID-19 pandemic. We agree.

In response to the COVID-19 pandemic, Governor Gretchen Whitmer issued a series of executive orders which afforded immunity to healthcare facilities and professionals in certain instances. See Executive Order No. 2020-30; Executive Order No. 2020-61. Thereafter, our Legislature codified the immunity granted in these executive orders with language mirroring the language of the executive orders:

> A health care provider or health care facility that provides health care services in support of this state's response to the COVID-19 pandemic is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility. [MCL 691.1475].

The immunity granted by this statute applies to services provided "on or after March 29, 2020 and before July 14, 2020." MCL 691.1477.

This Court has addressed the language of MCL 691.1475 in three published cases. First, in *Franklin*, ___ Mich App at ___; slip op at 9, this Court concluded that the immunity conferred by the PHCIA is not limited to services strictly provided to treat a patient for COVID-19. In that case, the plaintiff sought treatment at the defendant's hospital for shortness of breath. *Id*. at 1. He tested positive for COVID-19, was admitted to the COVID-19 floor, and was intubated. *Id*. at 1-2. During his stay at the hospital, the plaintiff developed pressure ulcers. *Id*. at 2. He later sued the defendants for medical malpractice, alleging they failed to appropriately treat the pressure ulcers. *Id*. The Court construed the language "health care services in support of this state's response to the COVID-19 pandemic" as used in MCL 691.1475 to encompass "healthcare

-3-

services that assisted, helped, or promoted the state's reactions and actions taken as a result of the COVID-19 pandemic. This language includes the healthcare services that healthcare facilities like defendant gave to those infected with COVID-19 and regular healthcare services provided during the statutory period." *Id*. at 8. The Court concluded the plaintiff's claims were barred by the PHCIA because the pressure ulcers he developed while being treated for COVID-19 were "a consequence of the care defendant provided in response to COVID-19." *Id*. at 9.

Second, in *Skipper-Baines v Bd of Hosp Managers for City of Flint*, ___ Mich App ___; ___ NW3d ___ (2024) (Docket No. 365137), slip op at 4, this Court explained there must be a connection between the pandemic and the medical services provided to the patient that gives rise to the cause of action. In that case, the decedent was admitted to the hospital after he was found unresponsive and underwent a minor surgery to treat gallbladder disease. *Id*. at 1. During his hospital stay, he was placed in a room with a mentally unstable roommate, who was assigned a "sitter" because he was known to have violent outbursts. *Id*. After his surgery, the decedent was attacked and injured by the roommate. *Id*. at 2. Thereafter, the decedent's health declined, and he died. *Id*. At some point after his admission to the hospital, the plaintiff contracted COVID-19 and his autopsy report listed COVID-19 associated pneumonia as a contributing cause of death. *Id*. The plaintiff sued the defendants for medical malpractice and ordinary negligence, asserting that the defendant made it possible for the decedent to be assaulted by his roommate. *Id*.

This Court held that immunity did not bar the claim because the cause of action was premised entirely on the beating inflicted on the decedent. *Id*. at 3. The alleged negligent act was placing the decedent in a room with an unsafe roommate and failing to deploy safety measures to protect him. *Id*. The decedent and his attacker were not being treated for COVID-19 when he was attacked and there was no suggestion that COVID-19 spurred the attack. *Id*. The fact that he contracted COVID-19 at some point while being treated for a different illness was unrelated to the incident giving rising to the claims. *Id*.

Third, in *Jokinen v Beaumont Hosp Troy*, ___ Mich App ___; ___ NW3d ___ (2025) (Docket No. 370983); slip op at 1, an 88-year-old decedent was transferred from a senior living facility to the defendant's hospital after the decedent suffered a fall. She received treatment over the next ten days and was assessed for a risk of pressure injuries. *Id*. at 1-2. Thereafter, she was discharged from the hospital and moved to a facility where her pressure injuries were first observed. *Id*. at 2. Her condition worsened and she was readmitted to the hospital for a pressure ulcer. *Id*. When the decedent died, her death certificate listed her cause of death as sepsis due to a pressure ulcer, cardio myopathy, and coronary artery disease. *Id*. The plaintiff brought medical-malpractice claims against the defendants for negligently treating the decedent's pressure wounds. *Id*.

This Court concluded that the defendants were not entitled to immunity under the PHCIA, explaining that the decedent was never treated for COVID-19 or tested positive for it. *Id*. at 7. The Court responded to the defendants' argument that the decedent's development of the pressure ulcers and the failure to treat those injuries were byproducts of the demands and protocols during the COVID-19 by noting that summary disposition was granted under MCR 2.116(C)(8), and nothing in the parties' pleadings suggested that there was a factual basis for this argument. *Id*.

In the present case, the trial court erred by granting summary disposition in defendants' favor because the services that allegedly caused the injury were not given in support of this state's response to the pandemic. As noted by this Court in *Skipper-Baines*, ___ Mich App at ___; slip op at 4, there must be a connection between the COVID-19 pandemic and the alleged negligence or malpractice. There is no dispute that Dr. Ahmed was a healthcare provider and the other defendants were healthcare facilities. Additionally, the services provided by defendants alleged resulting in the injury occurred during the statutory time period in MCL 691.1477. However, the record before us does not establish a connection between the alleged malpractice and the COVID-19 pandemic.

Plaintiff's medical-malpractice claim stems from defendants' alleged failure to timely diagnose and treat plaintiff's prostate cancer, which diminished plaintiff's chances of being cured and of surviving the metastatic cancer. Plaintiff sought treatment for urine retention at Comprehensive Urology, a private urology practice, and was treated for months before he was ultimately diagnosed with prostate cancer. During that time, he underwent procedures, surgeries, and was placed on medication to treat urine retention. Unlike the plaintiff in *Franklin*, there is no allegation or record evidence that plaintiff tested positive for COVID-19 or was being treated for COVID-19 at any point during the course of his treatment for urine retention. Likewise, there is no allegation that plaintiff was being treated at a facility that was otherwise treating patients for COVID-19.

Defendants raise two arguments in an attempt to connect this case to the COVID-19 pandemic. They first argue they are immune from plaintiff's medical-malpractice claims because Dr. Ahmed provided healthcare services in response to the COVID-19 pandemic as the Chief of Staff of Beaumont Hospital in Wayne, which was a hospital treating patients with COVID-19, at the time he was seeing plaintiff for urine retention. However, Dr. Ahmed did not treat plaintiff at Beaumont Hospital. He provided healthcare services to plaintiff at Comprehensive Urology, which is a private practice separate from Beaumont Hospital. There is no record evidence to support that Dr Ahmed's role as Chief of Staff at the hospital was relevant to his treatment of plaintiff at Comprehensive Urology.

Defendants also argue there is a connection between the alleged failure to diagnose plaintiff and the COVID-19 pandemic because plaintiff could not have his blood drawn onsite at Comprehensive Urology to test his PSA levels, which would have triggered the need for a biopsy and led to an earlier cancer diagnosis. Defendants contend that onsite blood testing was unavailable because the COVID-19 pandemic caused a shortage in the availability of phlebotomists. As an initial matter, this argument is unsupported by the record evidence. Dr. Ahmed did testify that there was not an opportunity to draw plaintiff's blood onsite at Comprehensive Urology because the facility did not have a phlebotomist during the pandemic; however, he also testified that, even before the pandemic, his practice did not always have phlebotomists on staff and only provided blood testing services when phlebotomists were available. When asked why he did not test plaintiff's PSA levels, Dr. Ahmed offered reasons unconnected to the pandemic for the failure to test plaintiff's PSA levels throughout the course of his treatment. Dr. Ahmed testified that he did not test plaintiff's PSA level early in his treatment because Dr. Ahmed believed the results would be artificially inflated. He even testified that he gave plaintiff an order to test his PSA levels at an offsite facility in July 2020, and plaintiff himself

failed to get that test performed. At no point did Dr. Ahmed testify, nor does the record evidence support, that the COVID-19 pandemic prevented him from testing plaintiff's PSA level.

We further note that the alleged failure to obtain a PSA blood test is only one of various acts or omissions pleaded by plaintiff in support of his medical-malpractice claim. Plaintiff's claim was that defendants failed to diagnose his prostate cancer over the period in which plaintiff was under Dr. Ahmed's care. Plaintiff alleged various acts and omissions besides the failure to perform the PSA blood test in support of this claim, such as performing several tests and procedures that delayed the possibility of diagnosing the cancer and failing to obtain tissue samples to biopsy during any of those several procedures. Defendants have not claimed that the other alleged diagnostic shortcomings had some connection to the COVID-19 pandemic.

Plaintiff's complaint stems from alleged injuries arising from the failure to diagnose his prostate cancer. The record evidence does not demonstrate that there was a connection between the alleged malpractice and the COVID-19 pandemic. Therefore, on the record before this Court, the trial court erred when it granted summary disposition in defendants' favor.[2]

Reversed and remanded for further proceedings. We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Thomas C. Cameron
/s/ Sima G. Patel

---

[2] We note, in addition to the three published cases discussed, our Court has addressed the questions raised in this matter in several unpublished decisions as well and arrived at essentially the same conclusions as in the published decisions. See *Anderson v Ascension Providence Hosp*, unpublished per curiam opinion of the Court of Appeals, issued December 18, 2024 (Docket No. 365559) (applying PHCIA immunity when the plaintiff sought mental-health treatment for a risk of suicide for pandemic-related stress and suffering a fall when left unassisted by the defendant hospital); *Harris v Rhema-Belmont Operating, LLC*, unpublished per curiam opinion of the Court of Appeals, issued January 27, 2025 (Docket No. 367678) (applying PHCIA immunity where a decedent developed pressure wounds and died while she was being treated for COVID-19 related pneumonia); *Monroe v St Joseph Hosp, Pontiac, Trinity Health-Mich*, unpublished per curiam opinion of the Court of Appeals, issued March 21 2025 (Docket No. 368667) (applying PHCIA immunity to a patient admitted with generalized weakness, low blood pressure, and a diagnosis of likely COVID-19 who suffered pressure wounds while in the defendant's care); *Pakenas v McLaren Macomb*, unpublished per curiam opinion of the Court of Appeals, issued September 11, 2025 (Docket Nos. 369752 and 372858) (finding PHCIA immunity did not apply to the claims of a patient who slipped and fell in a pre-discharge shower when briefly left unattended and the patient had never been treated or diagnosed with COVID-19).